[No. 41783.    En Banc.    October 14, 1971.]

FRED H. DORE et al., *Appellants,* v. GEORGE KINNEAR et al., *Respondents.*

*Dore & Dubuar,* by *Joseph O. Masterson* and *Fred H. Dore,* for appellants.

*Slade Gorton, Attorney General, Timothy R. Malone, Assistant, Christopher T. Bayley, Prosecuting Attorney, Elmer E. Johnston, Jr., Chief Civil Deputy,* and *William R. Creech, Deputy,* for respondents.

*Robert E. Schillberg, Prosecuting Attorney, Allen J. Hendricks, Deputy,* and *Edwards E. Merges,* amici curiae.

HUNTER, J.—This is an action by the plaintiffs (appellants), as residents and taxpayers in King County on behalf of themselves and other taxpayers similarly situated, seeking a permanent injunction restraining the defendants (respondents), the Washington State Director of Revenue, the King County Assessor, the King County Executive and the King County Board of Equalization, from placing the assessed values obtained by a revaluation of the plaintiffs' property on the King County assessment rolls for the payment of real property taxes for the year 1971.

On September 2, 1969, the director of the Department of Revenue entered into a contract with John Spellman, King County Executive, for appraisal funds appropriated by the state, Laws of 1969, Ex. Ses., ch. 282, § 4, p. 2745; Laws of 1970, Ex. Ses., ch. 95, § 1, p. 736, for the purpose of undertaking a comprehensive revaluation of real property in King County over a 4-year period.

The program provided that for each of the 4 years, approximately 25 per cent of the 450,000 parcels of real property located in King County would be revalued and placed

upon the assessment rolls. The detailed plan provided that approximately 90,000 parcels in King County in the area bounded by the Snohomish-King County line on the north, Lake Washington Ship Canal on the south, Lake·Washington on the east and Puget Sound on the west, would be revalued and placed upon the assessment rolls for the first year of the 4-year cycle.

A contract for appraisals was entered into with the Jacobs Company, Inc., an Illinois corporation, to appraise approximately 70,000 parcels of property during the first year, and the remaining 20,000 parcels located in the Shoreline school district were to be appraised by the King County Assessor's staff.

By May 31, 1970, the Jacobs Company, Inc. had completed appraisals on 27,000 parcels out of its total of 70,000. The King County Assessor's office placed these new values on the assessment rolls for the purpose of taxes payable in 1971. As of the same date appraisers on the King County Assessor's staff had completed appraisals of the buildings and improvements on 7,000 parcels located in the Shoreline school district, but had not appraised the land. The new values for these buildings and improvements were not placed on the assessment rolls for taxes payable in 1971.

The contentions of the plaintiffs, which we deem critical to the disposition of the case, are that the revaluation of only 27,000 parcels and placing them on the 1971 assessment rolls, was a failure of compliance with the 4-year cyclical revaluation program as directed by the legislature in RCW 84.41.030; that the actions of the King County Assessor were arbitrary and capricious and grossly discriminatory, and were therefore in contravention of the equal protection clauses of the federal and state constitutions (U.S. Const. amend. 14; Const. art. 1, § 12), as well as the uniformity provisions of the fourteenth amendment to the state constitution, and that this increased tax on their property, resulting from the revaluation, was void. They therefore brought this action to restrain the county from its collection. The trial court ruled in favor of the defendants,

thus denying the plaintiffs the relief they sought. This appeal followed.

On March 3, 1971, the plaintiffs filed a motion in this court for a temporary injunction, pending the resolution of this appeal, to restrain the defendants from collecting the increased tax for the year of 1971, by reason of the revaluation of the 27,000 parcels owned by these plaintiffs. This relief was granted by this court in its order dated March 29, 1971.

In this appeal now before us on the merits, it is the defendants' position that the conduct of the county assessor was not intentionally discriminatory, and that a revision of the appraisal program will be made to include all the property in King County in the remaining 3 years of the cyclical period; that this, in effect, would cure any deviation that has taken place during the first year of the cycle. We disagree with this rationale.

■ The legislature has vested in county authorities the power and duty to list, appraise, and assess all taxable property within the county, and to levy and collect all such property taxes. These responsibilities are not vested in the county authorities without conditions and limitations which they are compelled to follow. We have repeatedly held that county authorities are totally dependent upon the legislature for any power which they may exercise in the assessing and levying of taxes. *State ex rel. School Dist. 37 v. Clark County*, 177 Wash. 314, 31 P.2d 897 (1934); *Great Northern Ry. v. Stevens County*, 108 Wash. 238, 183 P. 65 (1919).

In the instant case, the county assessors are directed to maintain a systematic and continuous 4-year cyclical revaluation program as prescribed by the legislature in RCW 84.41.030. This statute provides as follows:

> Each county assessor shall commence, immediately if possible, but no later than January 1, 1956, a comprehensive program of revaluation of all taxable property within his respective county. Such program shall progress at a rate which will result in the revaluation of all taxable property within the county before June 1, 1958.

Each assessor shall thereafter maintain an active *and systematic program* of revaluation on a continuous basis, and shall establish a revaluation schedule which will result in revaluation of all taxable property within the county at least once each four years. A copy of such schedule shall be filed by each assessor with the tax commission before October 15, 1956.

(Italics ours.)

In 1969 the legislature, recognizing the inequalities in the revaluation programs, passed a general appropriation act making funds available to the county assessors. Pursuant to the requirements of Laws of 1969, Ex. Ses., ch. 282, § 4, p. 2745, the King County Assessor submitted a comprehensive revaluation plan to the Department of Revenue in order that King County may qualify for funding of the revaluation program. The purpose of the funds was to assist the assessor in maintaining a systematic revaluation program as required by RCW 84.41.030, *supra.* The memorandum of agreement entered into between the Washington State Department of Revenue and King County on September 2, 1969, sets forth the purpose of the grant:

> WHEREAS, It has been determined that the County does not have sufficient resources to effectively carry out its obligation under Chapter 84.41 RCW, to revalue real property within its boundaries for ad valorem tax purposes, and
> WHEREAS, The Legislature of the State of Washington has provided the Department of Revenue with funds to aid counties in revaluation programs, . . .

The revaluation program initiated in 1969 by the King County Assessor with state funding was an apparent attempt to comply with RCW 84.41.030, *supra.* However, the implementation of the program lacked any resemblance of a comprehensive, systematic, and continuous revaluation program.

As previously discussed in the facts, the revaluation of the 90,000 parcels in phase one of the program was to be a joint effort of the Jacobs Company, Inc. and the King County Assessor's office, with the latter responsible for re-

valuing 20,000 parcels in the Shoreline school district. The record reveals that the assessor had only four or five appraisers out of his 60-member staff working in the Shoreline area prior to May 31, 1970. Revaluations on buildings and improvements were completed on 7,000 parcels with no final values, including land and buildings together, being established. The assessor refrained from placing these new values as to buildings and improvements on the 1970 assessment rolls for 1971 taxes. During this same period, prior to May 31, 1970, the assessor's office revalued the land only on 22,000 parcels, and placed these new values on the 1970 assessment rolls. These parcels were located outside of the phase one area and were not valued pursuant to the new revaluation program; however, these same parcels were to be revalued in subsequent phases of the new program. The explanation for this work was that the assessor's office was attempting to update their old cycle and programs.

The contract between the Jacobs Company, Inc. and King County for the revaluation of 70,000 of the 90,000 parcels in phase one of the program was entered into on October 14, 1969. The contract provided that the first year phase of the revaluation program was to be completed in less than 3 months by December 31, 1969. However, on October 23, 1969, 9 days after the contract was entered into, a work plan was added to the contract dividing the 70,000 parcels into two parts so that the Jacobs Company, Inc. would revalue only 40,000 parcels by April 30, 1970, and the remainder of the 70,000 parcels by December 31, 1970, of which 30,000 parcels would not be eligible for placement on the 1971 tax rolls. The language of the revision is as follows:

*Completion Schedule*
The completion schedule of work within the Phase I Project Area will be staggered by Parts A and B, west and east of the Seattle Freeway, as follows:
*Part A—West of Freeway*—all appraisal work in this part of the Phase I Project area will be completed and delivered to the County Assessor May 15, 1970 with

new and remodeled structures appraised as of April 30, 1970. Testimony on Part A appraisal before the King County Board of Equalization will be given starting July 1, 1970.

*Part B—East of Freeway*—all appraisal work in this part of the Phase I Project area will be completed by December 31, 1970 with the exception that new buildings or buildings altered or remodeled shall be reappraised as of April 30, 1971 and these up-dated appraisals shall be delivered to the County Assessor by May 15, 1971. Testimony on Part B appraisals before the King County Board of Equalization will be given starting July 1, 1971.

As of May 31, 1970, the date by which the new revaluations must have been completed in order to be placed on the tax rolls for the year of 1971, the Jacobs Company, Inc. had completed only 27,000 parcels.

The record further shows that under the agreement with the Washington State Department of Revenue, dated September 2, 1969, the work of phase one was not required to be completed until June 30, 1971. This agreement provided, in part, as follows:

1. *Eligibility for Grant Assistance.* The Department agrees to certify to the State Treasurer that the County is eligible for grant assistance and shall be compensated the total sum of $1,091,379.00 or any portion thereof for the satisfactory performance of the work set forth in the Implementation of Project Area I of the plan for revaluation as submitted by the County and approved by the Department on September 2, 1969, and any other area that may be contracted for within the allowable funds.

2. *Time of Performance.* It is expressly agreed and understood that the amount set forth in section I above shall constitute the total compensation for the work so described and that said work shall be completed on or before June 30, 1971.

It is an inescapable conclusion from the above record that from the beginning of the implementation of the first phase of the 4-year cyclical program the assessor knew he could not complete the first phase of the revaluation program prior to May 30, 1970; that he was not required by his

agreement with the Department of Revenue to complete the first phase of the revaluation program by May 30, 1970, and that he did not intend to conform with the first-year phase of the program, but planned on completing the revaluation of a greater percentage of the parcels in phase one after May 30, 1970, placing them on the assessment rolls for tax purposes for the year of 1972 rather than 1971.

This conclusion is further unassailable by reason of the assessor's failure to revalue and place even one of the remaining 20,000 parcels on the assessment rolls for 1971 taxes as provided in the first phase of the plan.

The plan in effect was converted to a 3-year plan for the revaluation of 94 per cent of the remaining taxable parcels of King County. If the cyclical period is to be converted to a 3-year cycle for the owners of 94 per cent of the taxable parcels, as the record now shows, it would appear the plaintiff owners of 6 per cent of the parcels should receive like treatment. Therefore, by placing the 27,000 parcels in phase one on the 1971 assessment rolls instead of the 1972 assessment rolls, as will be the case of the remaining 90,000 parcels in the area of phase one, constituted unequal treatment to the taxpayers in the phase one area.

Such willful departure from the systematic plan by the county assessor was completely out of harmony with the fundamental purpose of chapter 84.41. This purpose is clearly defined in RCW 84.41.010 which declares in part:

> Traditional public policy of the state has vested large measure of control in matters of property valuation in county government, and the state hereby declares its purpose to continue such policy. However, present statutes and practices thereunder have failed to achieve the measure of uniformity required by the Constitution; *the resultant widespread inequality and nonuniformity in valuation of property can and should no longer be tolerated.* It thus becomes necessary to require general revaluation of property throughout the state.

(Italics ours.)

In *Carkonen v. Williams*, 76 Wn.2d 617, 633, 458 P.2d 280

(1969), we stated the requirements of a cyclical program essential to constitutional standards:

In keeping with the import of the *Sunday Lake* decision [*Sunday Lake Iron Co. v. Township of Wakefield,* 247 U.S. 350, 62 L. Ed. 1154, 38 S. Ct. 495 (1918)], state courts which have considered cyclical revaluation programs have generally found them to be compatible with constitutional equal protection and uniformity provisions, *provided they be carried out systematically* and *without intentional discrimination.*

(Italics ours.) We therein held that in view of the manpower and budgetary problems the assessors were endeavoring to pursue a systematic, nondiscriminatory cyclical approach to revaluation. The facts peculiar to the instant case are incompatible with those facts controlling our decision in the *Carkonen* case, and therefore cannot support a similar holding.

Thus, where a cyclical program of revaluation is undertaken, a systematic and consistent program of revaluation must be maintained during each year of the cyclical period in a county. This would require that substantially an equal amount of taxable property in a county be revalued in each year of the cyclical program in order that all taxpayers receive the same treatment within the cyclical period to avoid derogation of the equal protection clauses of our federal and state constitutions and the uniformity of taxation clauses of our state constitution.

This piecemeal revaluation has resulted in gross discrimination against the owners of these 27,000 parcels and is reflected not only in the higher taxes on their property for a longer period of time within the cyclical period than against the other taxpayers of the county not revalued, but also could result in a disproportionate millage on their property to which other property in the county not revalued will not be subjected during the cyclical period.

The millage to be levied by the county each year is dependent upon the revenues needed to meet the expenditures of the county, and other tax districts therein for that year. RCW 84.52.010; RCW 84.41.050. The failure of the

county assessor to revalue more than approximately 6 per cent of the taxable property in King County for the first cycle of the 4-year period would require a higher millage than would have otherwise been required had a systematic revaluation of substantially 25 per cent of the taxable county property been made for that year. This would place an additional disproportionate burden upon the owners of the 27,000 parcels of property as compared to the other taxpayers of King County whose property had not been revalued, and which would not be equalized within the 4-year cycle and subsequent 4-year cyclical periods as contemplated by RCW 84.41.030, *supra.*

The legislature was cognizant of this evil and specifically declared this to be one of the reasons why the county assessors must establish and maintain systematic and continuous revaluation programs. Again, RCW 84.41.010 provides in part as follows:

> Serious nonuniformity in valuations exists both between similar property within the various taxing districts and between general levels of valuation of the various counties. Such nonuniformity results in inequality in taxation contrary to standards of fairness and uniformity required and established by the Constitution and is of such flagrant and widespread occurrence as to constitute a grave emergency adversely affecting state and local government and the welfare of all the people.

The defendants cite *Sunday Lake Iron Co. v. Wakefield,* 247 U.S. 350, 62 L. Ed. 1154, 38 S. Ct. 495 (1918), in support of their theory that the revising of the program to include the omitted property in the remaining 3 years of the 4-year cyclical period, would rectify the inequities. This case is not apposite; it involved an erroneous assessment of only one parcel of property by an inexperienced member of the assessor's staff and no bad faith was involved, and it was not related to a cyclical program. Other cases cited by counsel did not involve a willful departure from a cyclical program.

In the instant case, we cannot ignore the rights of the complaining taxpayers on the basis that the inequities will

be immediately rectified. The actions of the King County Assessor did not substantially comply with any systematic and comprehensive revaluation program as heretofore stated, and cannot be equalized and rectified within the 4-year cycle or in succeeding cyclical periods.

The county assessor's revaluation of this small percentage of taxable property in King County placed on the assessment rolls for 1971, the first year of the 4-year cyclical period, was such a radical departure from the programmed plan for revaluation of the taxable property of King County, and was so grossly contrary to the systematic revaluation of taxable property required by the statute, *supra*, all within the full knowledge of the assessor, that it was *inherently* arbitrary and capricious conduct. This discriminatory action of the county assessor as to these plaintiffs was in derogation of the equal protection clauses of our federal and state constitutions and the uniformity clause of our state constitution. The increased tax imposed upon these taxpayers, resulting from the revaluation of their property, was therefore void. The judgment of the trial court is reversed, and the county is permanently restrained from the collection of this increased tax for the taxable year of 1971.

The defendants now contend, however, for the first time on appeal, that this is not a class action for the reason that the plaintiff owners of the 27,000 parcels in the phase one area were not given notice under Civil Rules for Superior Court (CR 23), and are therefore not entitled to relief. This contention is without merit.

At the time this court granted temporary relief to these plaintiffs by the entry of its temporary order restraining the defendants from the collection of the above stated increased tax, pending the resolution of this appeal, no objection was made to our granting this relief to these plaintiffs on the grounds that this was not a class action. We hold the defendants have therefore waived their objection that this case is not a class action. In any event, the record shows that at the inception of this case the Honora-

ble David W. Soukup, presiding judge of the King County Superior Court, granted the plaintiffs' motion to maintain a class action under CR 23, and ordered the case

pre-assigned to a particular judge and that such judge delineate and set forth the common questions of fact to be resolved in the class action and the form of the notice that should be prescribed, in giving notice to the various members of the class in the affected area.

■ The undisputed evidence in this record shows this case is a classic class action falling under the following category of CR 23:

(a) . . . One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) . . . An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

. . .

(2) The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

There is no dispute in this case that this is an action for injunctive relief under (b)(2), and the decisive issue in the case affects in common every member of the class.

The notice requirement in CR 23 is found in paragraph (c)(2) and applies to class actions maintained under paragraph (b)(3), and not to class actions which are maintained under paragraph (b)(2). *See* 3A L. Orland, Wash. Prac. (2d ed. 1968), at 432 and 433. CR 23 further provides, however, in (d)(2) that the court may require notice "for the protection of the members of the class or otherwise for the fair conduct of the action. . . ." Manifestly, this

notice is for the benefit of the members of the class to allow them to object to their inclusion in the case or to be bound by the judgment in the event their rights may in any way be adversely affected. This notice is, at the most, discretionary with the trial judge. *See* 3A L. Orland, Wash. Prac. (2d ed. 1968), at 441. It is not clear from the record as to whether the trial judge exercised his discretion, but the record indicates that no formal notice was given.

Under the facts of this case, we hold that the failure to give the above stated formal notice to these plaintiff owners of the 27,000 parcels is in no manner fatal to their class action for the reason that by our disposition of this case, no rights of these plaintiffs have been prejudiced or adversely affected by their being included in this action. We hold this to be a valid class action and that all the plaintiff owners of the 27,000 parcels in phase one of this 4-year cyclical program are entitled to the relief afforded by this decision.

In view of our disposition of this case, we need not discuss the other contentions of the plaintiffs; however, we find them to be without merit.

The $500 bond required by this court in granting the temporary restraining order shall be returned to the party posting the same.

It is so ordered.

HAMILTON, C.J., FINLEY, ROSELLINI, and HALE, JJ., concur.

FINLEY, J. (concurring specially)—I have signed and concur in the majority opinion. However, I feel constrained to make a brief statement both in response to the dissent by Justice Neill and in support of the majority opinion.

It seems to me unquestionably that taxpayers in the Jacobs area, as pointed out in the majority, are confronted with inequities and lack of uniformity as to their taxes. By the same token, other taxpayers in King County and elsewhere in the state may be confronted with inequities and lack of uniformity in their taxes. These unfortunate results are a consequence of constitutionally questionable practices

in the assessment of taxes which have existed in this state for a considerable time, in fact too long.

In *State ex rel. Barlow v. Kinnear,* 70 Wn.2d 482, 423 P.2d 937 (1967), this court called the turn on one of these practices; namely, that under our constitution, article 7, section 2 (amendment 17), taxes must be assessed on the basis of 50 per cent of true and fair value. In *Carkonen v. Williams,* 76 Wn.2d 617, 458 P.2d 280 (1969), the court attempted to call a turn on another long existing practice, long overdue for change and reform more in accordance with the provisions of Const. art. 7, § 1 (amendment 14) requiring uniformity in taxation. In *Carkonen,* the court did authorize a 4-year cycle for the reassessment of taxes. In the instant case, the majority again calls the turn on the failure of taxing authorities to comply with the 4-year cycle reluctantly authorized at least by some members of this court in the *Carkonen* case. Thus, I cannot agree with Justice Neill's thesis that inequities and lack of uniformity as to taxpayers outside of the Jacobs area—in King County and elsewhere in the state—should prompt and cause this court to deny relief for the obvious inequities and lack of uniformity confronting the taxpayers in the Jacobs area. In other words, two wrongs do not make a right, which should cause this court to withhold relief for a wrong called to our attention in a specific case. The Jacobs area taxpayers are litigants before this court in this class action. Other taxpayers are not.

NEILL, J. (dissenting)—A critical examination of the relevant facts and circumstances presented by this case convinces me that today's majority opinion dictates a result precisely the opposite of what it purports to be—a result which disrupts revaluation programs throughout the state, and which prolongs a condition of property tax favoritism. The beneficiaries of today's decision own, at most, 6 per cent of the taxable parcels of real estate in King County. These parcels are in an area of the county which enjoys something of a "tax shelter" in that it generally has not been revalued since 1961, while most of the county has

been revalued as recently as 1968. The victims are the owners of the remaining 94 per cent of taxable property whose 1971 taxes are based upon assessments more nearly approaching the constitutional standard of 50 per cent of current true and fair value. These include (a) owners of other parcels in the "Jacobs" area itself, (b) owners of those other parcels in King County, revalued in the same period, which account for 65 per cent of the year's true increase in assessed value and for over 80 per cent of the year's true increase in property taxes in the county, (c) owners of some 400,000 other parcels in King County as to which taxes are based upon more recent valuations, and (d) to the extent that today's result inhibits revaluation in other counties, owners of parcels throughout the state who will have to tolerate a prolonged period of unequal tax treatment.

Prior to the complained-of revaluations, parcels within the "Jacobs" area had a coefficient of dispersion of over 20.[1]

---

[1]Coefficient of dispersion is a statistical measure of the assessment inequities among individual parcels of real estate within a given taxing area. An understanding of the term requires acquaintance with three other technical terms used in property tax studies: "stated ratio," "assessed value" and "indicated ratio."

"Stated ratio" is ratio of assessed value to true and fair value. In Washington this ratio is constitutionally established at 50 per cent. "Assessed value" is the stated ratio expressed in dollars. "Indicated ratio" is a measure of current accuracy of the stated ratio. It expresses the average relationship, on a given date, of the assessed value on the tax rolls to their current true and fair value.

The degree of uniformity of assessments within a tax area is expressed by the "coefficient of dispersion" within that area. The expression is in terms of percentages by which the various parcels within the tax area differ, on the average, from the indicated ratio. See Taxable Property Values, Census of Governments, U.S. Dep't of Commerce, Bureau of the Census, 1967, Vol. 2; Property Taxes in the '70s, Dep't of Revenue, State of Washington, 1970, p. 137.

The higher the coefficient of dispersion, the greater disparity exists among the taxable parcels in the area. A generally acceptable percentage, denoting a high degree of uniformity, is about 15 per cent. Deviations of more than 20 per cent indicate existence of considerable inequity of tax burden among the individual taxpayers. See Property Revaluation 1970, a Progress Report to the 42d Legislature, Dep't of Revenue, State of Washington (1970).

This indicates a high degree of unequal tax treatment *within* the "Jacobs" area. The area, as a whole, was the most undervalued in the county and, within the area itself, some taxpayers were getting a freer ride than others. After the 1969-70 revaluations, the coefficient of dispersion was less than 15. That is, a high degree of uniformity in tax treatment had been achieved within the district. Today's majority decision vitiates that result and prolongs a situation of nonuniformity.

Owners of the approximately 423,000 parcels outside the "Jacobs" area are, by virtue of the majority decision, subjected to a greater tax burden. Some 22,000 of these were revalued during the same time as the "Jacobs" area parcels. The rest are on the rolls at valuations established in 1963 or later. Many, if not most, have been revalued since 1966. Today's result is at the expense of other King County property taxpayers.

To elucidate, taxes are not the result of assessments alone. In fact, under our constitutional scheme of property taxation, the assessment (assessed value) of property is pegged at 50 per cent of true and fair value. Recognizing that the ultimate tax burden is determined by a variable (the millage levied), the people have placed in our constitution a ceiling on permissible millage. This so-called "40 mill tax limit" may be exceeded only by the vote of the electorate within a taxing district. In this connection, it is of interest to note that the current millage levied in the portion of King County containing the "Jacobs" area is almost exactly one-half special levies voted by the people and one-half regular levies established by budgets prepared by the governing bodies of local taxing districts.

The assessed value of property is merely an inventory figure which arises from market factors and not from the action of the electorate or their elected governing bodies. Rather, the ultimate tax burden is established by dividing the aggregate of the assessed value of property in the area into the total revenue demands arising from the budgets of

the taxing districts including amounts voted by the people. RCW 84.52.010; 84.52.054.

It is thus apparent that a reduction in tax burden is best achieved by attacking the level of governmental expenditure, both those expenditures approved by direct vote of the electorate and those established by budgetary action of elected representatives. This is the most efficacious approach as it has a direct bearing on *all* taxpayers in the taxing district. A reduction of assessed value alone, to the extent that it applies to only some of the taxpayers in the area, is unavoidably at the expense of the other taxpayers in the area.

Today's decision, operating only to reduce the assessed value of a few of the county's tax parcels, leaving the revenue requirements intact as it must, obviously results in the majority of the county's taxpayers having to "pick up the slack" in the form of increased taxes on their property.

Plaintiffs do not contend that their taxes derive from assessments exceeding 50 per cent of fair market value; nor is there basis for such contention in the record. Rather, the essence of plaintiffs' complaint is that their parcels are currently less undervalued than others. From this, it is asserted that the uniformity requirement has been violated. Plaintiffs further contend that equal protection has been denied them in that only their portion of "phase one" of the 4-year revaluation plan was enrolled for 1971 taxes.

Plaintiffs' position is not entirely equitable. The parcels involved in the "Jacobs" area are the oldest, in terms of assessment, in the county. Land valuations date back to 1961, and building valuations were "crazy quilt" of differing valuation years. Thus, as a general rule, these parcels had a 10-year reprieve between valuations. The record indicates that, during that time, property values in the "Jacobs" area were increasing as much as 8 per cent annually. Yet, assessments remained at the 1961 level while most of the other parcels in the county were taxed upon more recent valuations. In my view, the stronger equities rest with these other parcels.

Defendant's activities are hardly so reprehensible as painted by the majority. A more accurate portrayal takes into account the preexisting situation. When, in September of 1969, we decided the case of *Carkonen v. Williams,* 76 Wn.2d 617, 458 P.2d 280 (1969), the following situation (as of 1966) was discussed: The budget of the King County Assessor allowed him to retain "only 81 qualified appraisers." There were about 400,000 parcels in the county and revaluation was proceeding on 6 to 8-year cycles. In 1966, the county's average assessment ratio was 23.7 per cent of true and fair value, and samplings of current sales denoted a 19.8 per cent indicated ratio.

Prior to the effect of *Carkonen v. Williams, supra* (*i.e.,* a doubling of the old King County stated ratio from 25 per cent to 50 per cent), property in the "Jacobs" area was at an indicated ratio of 13.79 per cent.

In *Carkonen* we rejected arguments quite similar to those of plaintiffs'. There it was asserted that portions of plaintiffs' taxes were in contravention of constitutional equal protection and uniformity provisions. We said (76 Wn.2d at 625):

As we have noted, the evidence revealed and the trial court so found—indeed it is common knowledge—that the practice of disparate underassessing at the county level is and has been statewide and one indulged in for many years if not, in fact, a carry-over of sorts from territorial days. Although the practice of underassessment, and the inability to effectively bring about a uniform compliance with the constitutionally required assessment ratio, have in a large part contributed to the imbroglio of the state's tax structure, nevertheless, the trial court conceived, and we concur, that an abrupt and retroactive application and enforcement of the appropriate assessment ratio would serve no immediate and useful purpose.

With specific reference to the cyclical revaluation statute, RCW 84.41.030, we noted that (76 Wn.2d at 630, 632):

[N]either the King nor Snohomish County Assessors have fully complied with the import of RCW 84.41.030. The King County Assessor, by reason of volume of work,

limited staffs and budgets, had proceeded on what amounts to a 6 to 8-year cycle of revaluation, depending to some degree on the type of property involved. . . .

. . .

*The evidence indicates quite clearly that, to the best of their ability, and with their limited staffs, the assessors involved were honestly endeavoring to pursue a systematic nondiscriminatory cyclical approach to revaluation.* In this vein it is to be borne in mind that the statute (RCW 84.41.040) requires a physical inspection of each of the parcels revalued and that King County had some 400,000 and Snohomish County some 250,000 parcels subject to revaluation. The sheer physical problem of annually inspecting the units of property involved, coupled with the staff and budgetary allocations required to accomplish such, lends wisdom to the legislative act authorizing and directing a cyclical approach, and virtually lays to rest any viable claim to intentional discrimination inhering in the system.

Furthermore, it appears from the evidence that in annually posting their revaluations the assessors were not only following the direction of RCW 84.40.020 but were also pursuing a statewide practice. *And, from the evidence adduced, it is not at all clear that by adopting the "hold back" and "base year" approach advocated by plaintiffs such a system would in fact produce, under the circumstances prevailing, any greater equality than that arising out of the cyclical system.* Lastly, the evidence does not disclose any gross or flagrant overvaluations insofar as any of plaintiffs' properties be concerned. Rather, plaintiffs predicate their attack upon assessment ratios, which in no case equal the 50 per cent ratio required by the constitution, and for the most part show only a disparity between counties and within the school district of approximately 5 per cent.

(Italics mine.) And we discussed the problem of cyclical revaluation in view of equal protection and tax uniformity principles (76 Wn.2d at 632-34):

In *Sunday Lake Iron Co. v. Township of Wakefield,* 247 U.S. 350, 62 L. Ed. 1154, 38 S. Ct. 495 (1918), in denying relief to a taxpayer claiming an increase in property valuation violated the equal protection clause of the federal constitution, the court stated, at 352:

The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents. And it must be regarded as settled that intentional systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of one taxed upon the full value of his property. [Citing case.] It is also clear that mere errors of judgment by officials will not support a claim of discrimination. There must be something more—something which in effect amounts to an intentional violation of the essential principle of practical uniformity. The good faith of such officers and the validity of their actions are presumed; when assailed, the burden of proof is upon the complaining party. [Citing cases.]

The record discloses facts which render it more than probable that plaintiff in error's mines were assessed for the year 1911 (but not before or afterwards) relatively higher than other lands within the county although the statute enjoined the same rule for all. But we are unable to conclude that the evidence suffices clearly to establish that the State Board entertained or is chargeable with any purpose or design to discriminate. Its action is not incompatible with an honest effort in new and difficult circumstances to adopt valuations not relatively unjust or unequal.

In keeping with the import of the *Sunday Lake* decision, state courts which have considered cyclical re-valuation programs have generally found them to be compatible with constitutional equal protection and uniformity provisions, provided they be carried out systematically and without intentional discrimination. *Hamilton v. Adkins,* 250 Ala. 557, 35 So. 2d 183, *cert. denied,* 335 U.S. 861, 93 L. Ed. 407, 69 S. Ct. 133 (1948); *Skinner v. New Mexico State Tax Comm'n,* 66 N.M. 221, 345 P.2d 750, 76 A.L.R.2d 1071 (1959). And, for similar but not identical import, see cases cited and discussed in *Tax— Incomplete Equalization Program,* Annot., 76 A.L.R.2d 1077 (1959).

This court, too, has considered, in part at least, the problems arising out of a cyclical program in *Mason County*

*Overtaxed, Inc. v. County of Mason,* 62 Wn.2d 677, 384 P.2d 352 (1963). In that case, it appeared that the Mason County Assessor was pursuing cyclical revaluation as set forth in RCW 84.41.030, which in turn produced substantial increases in the plaintiffs' property valuations as those properties were reached in the cyclical process. In denying the plaintiffs relief, we pointed out that the assessment ratio is predicated upon the market value of the property involved at the time of its valuation and that increases in real-estate assessments, without more, is as consistent with a preceding undervaluation, as it is with the idea of a current excessive valuation, and, upon these premises, held that the plaintiffs had failed to establish that their property had in fact been overvalued.

The same is true in the instant case.

Accordingly, we conclude that, although each of the assessors involved were precluded by fiscal, personnel, volume, and time considerations from precisely adhering to the statutorily designated cyclical schedule or from conducting annual total revaluation programs, it has not been shown that their honest attempts at compliance resulted in intentional discrimination, arbitrary action, constructive fraud, or grossly and relatively unfair assessments contrary to constitutional provisions relating to equal protection and uniformity.

Finally, we stated (76 Wn.2d at 635):

Again, as to plaintiffs' contentions, we find no gross or flagrant inequalities, intentional discrimination or constructive fraud springing from the actions of the King County Assessor. Although the practices may not be in strict conformity with the law, they do not render the resultant assessment void. *Ballard v. Wooster,* 182 Wash. 408, 45 P.2d 511 (1935).

Capsulized, *Carkonen* establishes that the constitutional 50 per cent requirement is mandatory, but does not require immediate and absolute uniformity. In this latter area, reality intervenes so that constitutional and statutory standards are considered satisfied by a cyclical revaluation program—so long as the program is systematic and without intentional discrimination. There is nothing *inherently* discriminatory in cyclical revaluation, that is, "intentional dis-

crimination" is not established by the fact that some parcels are revalued while others in the taxing area are not.

Pending the time when technology enables instant, total revaluations, cyclical revaluation on the shortest feasible cycles is the best that can be expected. In *Carkonen* we recognized that circumstances may be such that even the statutory 4-year cycle cannot be achieved. Such failure does not, ipso facto, void the resulting assessment. *Carkonen v. Williams, supra; Ballard v. Wooster,* 182 Wash. 408, 45 P.2d 511 (1935). No evidence was adduced in *Carkonen,* and I find none here, that such alternative approaches as "hold back" and "base year" provide any better equality in tax treatment. Until something better is put forward, the cyclical system is sufficient.

The majority declares that the facts of this case distinguish it from *Carkonen,* in that the taxes here are grossly discriminatory. In support of this conclusion, the majority observes that the "Jacobs" area consists of only 6 per cent of the total parcels in the county, that the county failed to achieve the goals set for "phase one" in its contract with the state, and that the pace of revaluation in the period involved did not approximate a 4-year cycle.

These practices, though falling short of goals and failing to comply with strict statutory requirements, do not render the resulting assessment void. RCW 84.41.020;[2] *Carkonen v. Williams, supra,* and cases cited. Failure to live up to the "phased" revaluation scheme contemplated in the contract subjects the county, at most, to possible loss of state financial assistance. The relevant statute (Laws of 1969, Ex. Ses., ch. 282, § 4) neither states nor intimates that such revaluations as are achieved will be nullified.

---

[2]RCW 84.41.020: "This chapter [84.41] does not, and is not intended to affect procedures whereby taxes are imposed either for local or state purposes. This chapter concerns solely the administrative procedures by which the true and fair value in money of property is determined. The process of valuation, which is distinct and separate from the process of levying and imposing a tax, does not result either in the imposition of a tax or the determination of the amount of a tax. This chapter is intended to, and applies only to procedures and methods whereby the value of property is ascertained."

Furthermore, the percentages are somewhat misleading. Although only the "Jacobs" area was revalued during this period as part of the "phased" plan, other parts of the county were also revalued for the 1970 assessment rolls. The majority would ignore these because they will again be revalued within the "phased" plan. But the statute (RCW 84.41.030) calls for revaluation "at least" every 4 years, and I see no reason for ignoring these parcels simply because they will be again revalued. The relevant fact is that 22,000 parcels, uncredited by the majority, were revalued during the 1969-70 period. Another relevant fact is that the "Jacobs" area revaluations were not the result of a full year's effort. Since the plan did not commence operation until November of 1969, we are talking about a 7-month period from then until the May 31, 1970, cut-off date. If my mathematics are correct, this means that the *rate* of revaluation for that period would have covered about 50,000 parcels, given a full year. The game of strategic statistics thus gives a percentage of 16 per cent (72,000/450,000), rather than 6 per cent. That is, during this period, the revaluation cycle was proceeding at a 6-year pace. In addition, the county placed some 6,600 new valuations on the 1970 rolls, and performed partial revaluations of 7,000 other parcels.

In 1966, a King County Assessor's staff of 81 appraisers was reassessing 400,000 parcels on a 6 to 8-year cycle. The stated ratio was 23.7 per cent, and the indicated ratio was 19.8 per cent for the county generally, but only 13.79 per cent in the "Jacobs" area. As of January 1, 1970, the assessor's office, with a staff of only 60 (plus assistance from the Jacobs Company), was reassessing 450,000 parcels on a 6-year cyclical rate. The stated ratio was 50 per cent, and the indicated ratio was 37.12 per cent generally and 46.83 per cent in the "Jacobs" area. This productivity, better than that upheld in *Carkonen,* was obtained despite the facts that the assessor's office was undertaking a new program and that the program began and was for the most part conducted under the impediment of winter weather. Statis-

tically, the revaluation process seems to have been satisfactory in this period.

The focus of revaluation in 1969-70 was upon those areas which had escaped revaluation for the longest period of time. As previously noted, the "Jacobs" area was, in general, the oldest of them all. In addition, there were 10 "spot" areas throughout the county of very old valuations. These were the areas, containing some 22,000 parcels, which the assessor's office revalued during this period, and to which the majority refers as "piecemeal revaluation." I agree that the revaluations were fragmented, but the revaluation was also systematic in the sense, more important than geography, of reassessing the "oldest" valuations first.

In my view, there is no invidious discrimination in the revaluation procedure involved in this case. We observed in *Carkonen* that a large increase in assessed value is as consistent with prior undervaluation as it is with current overvaluation. The record shows that such is precisely the case here. If there is unfairness, it is that which was imposed upon the other citizens of King County prior to this revaluation, and which the majority reimposes today.

For the reasons stated, I believe that plaintiffs have failed to show any gross inequity or bad faith on the part of defendants. The burden is plaintiffs', and they have not met it. *Carkonen v. Williams, supra.* To the contrary, the record shows that defendants were engaged in an honest endeavor to establish and pursue an improved "systematic nondiscriminatory cyclical approach to revaluation." New impediments should not be imposed on this endeavor. I would affirm the judgment of the trial court.

I have joined in the dissent of Justice Stafford that this is not a class action. From the standpoint of uniformity in valuations, today's result favors some "Jacobs" area taxpayers to the *detriment* of others in the same area. Consequently, the outcome of today's decision favors only 11 of the approximately 450,000 parcels in King County. Even if this were a proper class action as to 27,000 parcels, we would be dealing with only about 6 per cent of the parcels

in King County. As it is, absent class action features, we deal with a fraction so small that it disappears in the decimal places (less than 3/1,000 of 1 per cent). I believe the other 99.997 per cent of the taxpaying units merit more consideration. Their interests are substantial as well as massive.

Not heretofore having an opportunity to do so, I now express my disagreement with the issuance by this court in this cause of a temporary injunction prohibiting collection of 1971 taxes based on revaluations in the "Jacobs" area. We thereby departed from established precedent and statutory proscription.

We stated in *Roon v. King County,* 24 Wn.2d 519, 166 P.2d 165 (1946), that when the taxpayer's statutory right to pay a questioned tax under protest provides an adequate legal remedy, then the statutory remedy is exclusive. In the course of that decision, we observed at page 528:

> The essential purposes of the 1931 act were, and are, to furnish an adequate and sufficient remedy to the taxpayer in case of an illegal or unjust assessment for taxes, and, at the same time, to provide an expeditious method by which the various branches of government affected could obtain the revenue necessary to their maintenance, without protracted delay or the hazards incident to the former method of procedure. We believe that the appellant had a remedy that was plain, simple, speedy, adequate, and complete; . . . Under such circumstances, we see no occasion for the intervention by a court of equity or for the exercise of its inherent powers with respect to matters involving the legality of a tax.

*See also Shamley v. Olympia,* 47 Wn.2d 124, 286 P.2d 702 (1955); *Ballard v. Wooster,* 182 Wash. 408, 45 P.2d 511 (1935). *Cf., O'Brien v. Johnson,* 32 Wn.2d 404, 202 P.2d 248 (1949).

RCW 84.68 recognizes the several legitimate interests in property tax disputes. In addition to the unlitigated claims of the dissatisfied taxpayer, there is the interest of the public in seeing that taxes are timely and expeditiously collected. Further, there is the interest of the other taxpay-

ers (in this case, the owners of something in excess of 423,000 parcels) in seeing that *all* taxpayers share the burden of timely payment. Our cases recognize these interests, and stand for the proposition that the dissident taxpayer must accept the statutory relief of RCW 84.68 when that method is available and adequate.

I fail to see the inadequacy of the statutory remedy for plaintiffs. Their complaint is that a portion of their taxes have been illegally imposed. That is the complaint of all adjudicating taxpayers. If it were a reason for enjoining *collection*, then RCW 84.68 and its recognition of countervailing interests of the public, government, and the other taxpayers, would be emaciated. This cannot be a reason for declaring the statutory relief "inadequate."

Plaintiffs further argue that the excess *amount* of their taxes brings hardship upon them. As a homeowner, I am personally empathetic.[3] But as a judge, I cannot accept what is a legally incorrect and dangerous ground for declaring the statutory relief inadequate. The trial court has expressly reserved to each plaintiff the right to litigate the accuracy of the assessment on his property. Reliance on amount or percentage of tax increase as a basis for declaring the relief available under RCW 84.68 "inadequate," is a

---

[3]The millages levied in King County have been steadily increasing in recent years due both to actions of the electorate as to special levies and to actions of elected governing officials of taxing districts and agencies as to regular levies. A 1971 publication of the Dep't of Revenue of the State of Washington, *Property Tax Levy & Collection Statistics for 1970,* shows this increase for King County:

| 1967 taxes | 77.2 mills | |
|---|---|---|
| 1968 " | 85.1 " | |
| 1969 " | 89.1 " | |
| 1970 " | 98.8 " | |
| 1971 " | 100.9 " | (adjusted to pre-1971 measure due to 1970 amendment to RCW 84.52 .050 reducing maximum regular levies from 40 mills to 21 mills following the mandate of a 50 per cent assessment ratio. King County's 1971 levy is 53.02 mills on this new basis.) |

dangerous precedent. It opens the door to evasion of timely tax payment by those who can afford protracted litigation and would profit by the delay in payment. For these reasons, I dissent.

STAFFORD and WRIGHT, JJ., concur with NEILL, J.

STAFFORD, J. (dissenting)—A great portion of the thrust and breadth of the majority opinion has been achieved by characterizing this as a class action. A review of the record reveals that position is incorrect.

Subsequent to the filing of their complaint, plaintiffs moved to maintain the cause as a class action. The trial court entered a conditional order[4], pursuant to CR 23(c)(1), allowing plaintiffs to proceed as representatives of a class. However it specifically reserved for later determination the delineation of the common questions of fact to be resolved[5] and the *form* of notice to be given the members of the class.[6]

---

[4]The order of August 7, 1970 reads in pertinent part as follows: ". . . it is

"ORDERED, ADJUDGED and DECREED that the plaintiffs' Motion to Maintain Class Action be and it is hereby granted. It is further

"ORDERED, ADJUDGED and DECREED that the above captioned case shall be directed to be returned back to the presiding judge with instructions to have it pre-assigned to a particular judge and *that such judge delineate and set forth the common questions of fact to be resolved in the class action and the form of the notice that should be prescribed, in giving notice to the various members of the class in the affected area.*" (Italics mine.)

[5]CR 23(b)(3) reads as follows: "(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, *and in addition*:
"  .  .  .
"(3) *The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.*" (Italics mine.)

[6]CR 23(c)(2) reads as follows: "(2) *In any class action maintained under paragraph (b)(3),* the court *shall* direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will

There can be no question but that the trial court assumed, by its order, that notice should be furnished to all members of the class since the issue left open was the *form* of notice, *not whether notice should be furnished.*

Thereafter, the case was preassigned for trial. The court, acting pursuant to the prior order, ruled that the only common issue to be determined by a class action was the *form* of a "short form assessment protest" requested by the plaintiffs. The original order was amended, as authorized by CR 23(c) (1), to reserve for later determination, during the trial on the merits, all remaining issues including the question of whether there were issues of sufficient substance to merit *converting the matter into a class action.*[7]

The cause proceeded to hearing and, with exceptions unimportant here, the plaintiffs' complaint was dismissed with prejudice. The trial court *at no time converted the suit into a class action although it had reserved the power to do so.* Further, no *class* was ever determined upon which a judgment, favorable or unfavorable, would be binding; no form of notice was prescribed; and no form of notice was disseminated to prospective members of any class regardless of their designation. In short, *those things that were required to be done,* both by court rule and court order, *to finally convert the case into a class action,* were deemed unnecessary and *thus were not done.*

As pointed out in 3B, J. Moore, Federal Practice ¶ 23.55, at 1152-59 (2d ed. 1969), notice is a matter of due process

---

exclude him from the class if he so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if he desires, enter an appearance through his counsel." (Italics mine.)

[7] The order of September 3, 1970 read in part as follows: "With respect to the remaining issues, the determination as to whether or not such issues are proper for a class action pursuant to CR 23 will be determined during the trial on the merits . . . In the event it appears at any time during the trial on the merits that there are issues of sufficient substance to merit a class action, the trial will be interrupted so as to allow conversion of the action into a class action, with respect to remaining issues."

in all class actions brought under CR 23(b)(3) because there is no jural relationship between the members. They are merely fellow travelers related only by some common question of law or fact with a right to opt out of the class. The mandatory notice informs them of that right.

Although the plaintiffs' complaint denominated the lawsuit a class action and despite the fact that plaintiffs have referred to it as such in their brief, none of their 12 assignments of error remotely touch upon the trial court's eventual refusal to take those final steps necessary to convert the case into a class action pursuant to CR 23(c)(2). Having failed to assign error to the trial court's action, if it was error, this court cannot properly consider the matter. ROA I-43.

The plaintiffs belatedly raised the subject in their reply brief. We have held consistently, however, that an appellant may not present contentions or urge in his reply brief any grounds for reversal not clearly pointed out in his original brief. *Fosbre v. State,* 70 Wn.2d 578, 424 P.2d 901 (1967); *Johnson v. Phoenix Assurance Co.,* 70 Wn.2d 726, 425 P.2d 1 (1967); *Dickson v. United States Fid. & Guar. Co.,* 77 Wn.2d 785, 466 P.2d 515 (1970). Furthermore, ROA I-41(1) provides:

> But the appellant shall not be permitted to urge in any such reply brief . . . or on the hearing, any grounds for reversal not clearly pointed out in his original brief.

Thus, whether the trial court committed error in this regard is not properly before us even though mentioned in the reply brief. As the record now stands, one can only conclude that the case was never converted into a class action; that the issue is not before us; and that it was incorrect for the majority opinion to have extended its holding beyond the 11 plaintiffs in the case.

Assuming that a class action is properly before the court, the majority has held, incorrectly, that it was brought pursuant to the provisions of CR 23(b)(2) rather than CR 23(b)(3). The record is wholly devoid of support for such holding. Even the plaintiffs have not made that contention

in their brief. The assertion is volunteered by the majority.

Although the plaintiffs' complaint generally has denominated this a class action, they moved, pursuant to CR 23, to have the trial court declare the suit a class action and "to provide for *giving notice* to members of the class". The motion provided further:

> numerous questions of fact and law pertaining to the eleven plaintiffs' reappraisals and reassessments are typical of the other reassessments and reappraisals on other parcels in the area, some 70,000 in number. *That the questions of law and fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.* That the plaintiffs respectfully request that the plaintiffs and their attorneys be authorized to give notice of such class action through the publication of the suit in the three weekly newspapers that are circulated in the area . . .

(Italics mine.) Comparison of the italicized language with the language of CR 23(b)(3) reveals that the motion was couched in the *exact words* of CR 23(b)(3) which reads as follows:

> (b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, *and in addition*:
>
> . . .
>
> (3) *The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.*

(Italics mine.) Thus, plaintiffs' own pleadings make it graphically clear that the majority is incorrect in holding that the action was brought pursuant to CR 23(b)(2) rather than CR 23(b)(3).

The difference between having brought the case under CR 23(b)(3) rather than CR 23(b)(2) is significant. The rules make notice *mandatory* in all cases brought pursuant

to CR 23(b)(3), but make notice merely *discretionary* in cases brought pursuant to CR 23(b)(2).[8]

CR 23(c)(2) provides that in all cases brought under CR 23(b)(3) the trial court *shall direct* to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. CR 23(c)(2) provides further:

> The notice *shall* advise each member that (A) the court will exclude him from the class if he so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if he desires, enter an appearance through his counsel.

(Italics mine.)

The rationale behind the mandatory notice requirement for class actions brought pursuant to CR 23(b)(3) is readily apparent in this case, and was recognized by plaintiffs in their motion when they requested authorization to give notice. Lack of notice does great disservice, as well as denies due process of law, to property owners whom the majority opinion forces into this lawsuit without notice either that an action exists or that they are parties thereto.

It is to protect prospective members of a class from just such consequences that CR 23(c)(2) requires that they be informed of their right to be excluded from the action; that if they do not request exclusion, any judgment that is

---

[8]As pointed out in 3B, J. Moore, Federal Practice ¶ 23.72(2) (2d ed. 1969), at 1421:

> To place (d)(2) notice in proper perspective attention should be given to other provisions of Rule 23 dealing with notice. Under (c)(2), notice to all the members of a class in an action maintained under (b)(3) *must be given in order to give them an opportunity to request exclusion from the class, to inform them that the judgment will include them if they do not opt out, and to inform them that they may enter an appearance through counsel.* . . .

> Notice under (d)(2) is *discretionary* and may be used to supplement the *mandatory* notice required in *(b)(3)* class actions, as well as to give notice in (b)(1) and (b)(2) class suits.

(Footnotes omitted. Italics mine.)

rendered will be *res judicata*; and if one does not choose exclusion, he may enter an appearance through his own counsel.

The majority places little significance upon the due process requirement of notice. Acting with 20/20 hindsight, the majority has assumed that the class is obvious; that no one would refuse to be bound by a favorable result; that inasmuch as the opinion is favorable to the plaintiffs, it is therefore favorable to the owners of the 27,000 parcels of land, and thus:

> no rights of these plaintiffs [*i.e.*, the owners of the 27,000 parcels of land] have been prejudiced or adversely affected by their being included in the action. We hold this to be a valid class action and that all the plaintiff owners of the 27,000 parcels in phase one . . . are entitled to the relief afforded by this decision.

The foregoing assumptions are totally unwarranted. It is obvious that had the majority opinion been adverse to the plaintiffs on the appeal, few property owners would admit to having been a member of the unsuccessful class. They would have complained, with justification, that: (1) they had been incorrectly included as a member of the class; (2) that they were not given proper notice or opportunity to opt out of the action; or at least (3) that they were not allowed to choose their own attorney. Merely to state the logic of the situation is to refute the majority's position.

CR 23(c)(2) has carefully spelled out the protections to which the public, who may be unwittingly drawn into a proposed class action under CR 23(b)(3), are entitled. The plaintiffs failed to comply with the rule. Thus, the class action could not be properly maintained.

Furthermore, not all property owners in the area, or in similar areas of King County, will benefit by the decision. The record is clear that the assessed valuation of many parcels of land was reduced in the challenged reassessment. The majority opinion runs counter to the interest of all those who own such property. Their decision imposes upon these property owners the older and higher assessed valuation

because under CR 23 (c) (3) the judgment in a class action brought under CR 23(b) (2), as the majority holds this action was, includes all those whom the court finds to be members of the class, whether or not the judgment is favorable to the class or individual members thereof.

There are no provisions in CR 23 which expressly allow the members of a class, in an action brought under CR 23 (b) (2), to request exclusion from the class or to be separately represented. However, such members can be protected by a court order insuring that the representation is fair and adequate. CR 23(d)(2) provides that the court may make appropriate orders:

> (2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action[.]

Nevertheless, the majority has failed to require that even this minimal protection be given.

Even if the majority deems it unimportant for the above mentioned class of property owners to have been given a chance to opt out, at least they should have been given an opportunity to appear through their own counsel.

All 11 plaintiffs have an interest that is antagonistic to the landowners whose assessed valuation was lowered by the recent revaluation. This class of landowner would have every reason to oppose the assessment "roll back" proposed by the 11 plaintiffs. Therefore, even if the majority is correct in holding that this is a class action brought pursuant to CR 23 (b) (2), the plaintiffs had no right to maintain a class action in which their interests were antagonistic to those persons whom they purport to represent. *Hansberry v. Lee*, 311 U.S. 32, 44-45, 85 L. Ed. 22, 61 S. Ct. 115, 132 A.L.R. 741 (1940); *Brotherhood of Locomotive Firemen v. Graham*, 175 F.2d 802, 807 (D.C. Cir. 1948), *rev'd on other*

*grounds,* 338 U.S. 232, 94 L. Ed. 22, 70 S. Ct. 14 (1949); 3B, J. Moore, Federal Practice ¶ 23.07, at 401 (2d ed. 1969); *see also Schy v. Susquehanna Corp.,* 419 F.2d 1112, 1117 (7th Cir. 1970). This commonsense rule is particularly applicable to the instant situation.

The majority, in their attempt to apply the impact of this decision beyond the 11 plaintiffs, by classifying the cause as one brought under CR 23(b)(2), subverts the class action rules and the clear characterization of this action by the plaintiffs in their original motion. The effect of the majority decision is to destroy the protections built into CR 23.

Therefore, I dissent and concur with the dissent of Justice Neill.

NEILL and WRIGHT, JJ., concur with STAFFORD, J.

Petition for rehearing denied December 9, 1971.