[No. 42671.    En Banc.    July 19, 1973.]

THE DEPARTMENT OF REVENUE *et al., Appellants,* V. HARLEY H. HOPPE *et al., Respondents.*

*Slade Gorton, Attorney General,* and *William D. Dexter, Assistant,* for appellants.

*Christopher T. Bayley, Prosecuting Attorney,* by *J. Richard Quirk, Deputy,* for respondents Hoppe et al.

*Schweppe, Doolittle, Krug, Tausend, Beezer & Beierle,* by *Robert R. Beezer,* for respondents Scoones.

*G. Keith Grim,* and *Jennings P. Felix & Associates,* by *Jennings P. Felix,* amici curiae.

BRACHTENBACH, J.—While this appeal involves a multitude of issues involving this state's complex scheme of property taxation, a constitutional amendment, an initiative and various statutes, the pivotal question to be answered by this court is the maximum millage rate at which property will be taxed for collection in the calendar year 1973.

This controversy arises from the voters' adoption on November 7, 1972, of SJR 1 (now amendment 55 to our constitution) and Initiative Measure No. 44 (now Laws of 1973, ch. 2, § 1, RCW 84.52.050). SJR 1 imposes a constitutional limit of 1 percent of true and fair value on the maximum allowable rate of regular property tax levies, *i.e.,* 20 mills on 50 percent of the true and fair value of the property being taxed. Initiative 44 sets a limitation of 20 mills on the

dollar of assessed valuation, again for regular property tax levies. The texts of both measures are set forth in the appendix. The central issue is whether either, or both, apply to limit the taxes due and collectible in 1973.

The levy certified by the King County Council, collectible in 1973, requires a tax based on 22.0 mills in incorporated areas and 22.16 mills in unincorporated areas (exclusive of excess levies). Because of the state levy of 4 mills on the state equalized values, the actual levies would be 22.6 and 22.76 mills respectively, based on the county assessor's valuation.

The State Department of Revenue and its director brought this action to prohibit the King County Assessor from extending the regular property tax levies upon the tax rolls at millage rates less than those required to raise the amount of taxes levied for state and local purposes, as certified to the assessor by the King County Council. The assessor intended to reduce the state levy for schools and public assistance from 4 mills (4.6 mills on local values) to 1 mill and to increase the local school levy from 6 mills to 7 mills. This would cause the assessment to not exceed 20 mills, at least based on local valuation. The Scooneses, King County property owners, intervened, as did the Renton and Seattle school districts.

The trial court held that (1) SJR 1 does not affect and thereby limit the King County levies made in 1972 and collectible in 1973; (2) the latest statutory millage allocation (Laws of 1971, 1st Ex. Sess., ch. 299, § 24) is invalid along with Initiative 44 because the legislature did not follow the constitutional provisions governing proposed legislation and initiatives on the same subject; (3) Laws of 1971, 1st Ex. Sess., ch. 299, § 25 (imposing a state levy of 2 mills for schools) is not in conflict with Initiative 44 and is valid; (4) Laws of 1970, 1st Ex. Sess, ch. 92, § 5 is the applicable millage allocation statute in view of holding (2) above, thereby setting a 21-mill limit on the King County levy; (5) under RCW 84.52.010 the assessor is to reduce the millage in incorporated areas by $\frac{1}{8}$ mill for each taxing

district, and in unincorporated areas he is to reduce the millage of the junior taxing districts by uniform percentages.

■■■ We venture into the thicket of issues in this case with several fundamental precepts in mind:

(1) The spirit or intention of the law prevails over the letter thereof. *In re Horse Heaven Irr. Dist.,* 11 Wn.2d 218, 226, 118 P.2d 972 (1941).

(2) In case of doubt, taxing statutes are construed most strongly against the government and in favor of the taxpayer. *Foremost Dairies, Inc. v. State Tax Comm'n,* 75 Wn.2d 758, 762, 453 P.2d 870 (1969); *Gould v. Gould,* 245 U.S. 151, 62 L. Ed. 211, 38 S. Ct. 53 (1917).

(3) Words of a statute, unless otherwise defined, must be given their usual and ordinary meaning. *Foremost Dairies, Inc. v. State Tax Comm'n, supra.* This is true regardless of the policy of enacting the law or the seeming confusion that may follow its enforcement. *State v. Houck,* 32 Wn.2d 681, 685, 203 P.2d 693 (1949).

(4) These rules of construction apply equally to direct legislation by the people as to legislative enactments. *State ex rel. Jones v. Erickson,* 75 Mont. 429, 244 P. 287 (1926).

(5) The collective intent of the people becomes the object of the court's search for "legislative intent" when construing a law adopted by a vote of the people. E. Crawford, *The Construction of Statutes* § 365 (1940 ed.) at 745.

(6) Material in the official voters' pamphlet may be considered by the court in determining the purpose and intent of these acts. *Bayha v. PUD 1,* 2 Wn.2d 85, 97 P.2d 614 (1939).

The controlling language and limitation of SJR 1 is:

[*T*]*he aggregate of all tax levies* upon real and personal property by the state and all taxing districts now existing or hereafter created, *shall not in any year exceed one per centum* of the true and fair value of such property . . .

(Italics ours.)

The state contends that this limitation means that only

those taxes *levied* after the effective date of SJR 1 are so limited. We can find no such meaning in the quoted language. Nowhere does SJR 1 limit itself to levies made at any particular time. But, argues the state, the word levy is a word of art, a word having special meaning; in its narrow, technical sense it refers only to the legislative act of the county in adopting a levy ordinance. The state couples this argument with its assertion that the effective date of SJR 1 was December 7, 1972. Since the original King County levy ordinance was adopted before that date, it would follow that the levy, collectible in 1973, would not be subject to the 1 percent limitation.

Bearing in mind the construction principles cited above, and particularly the rule that words, unless otherwise defined, must be given their usual and ordinary meaning, does the word "levies" have such a usual and ordinary meaning that it can only mean the legislative function of adopting a levy ordinance?

The state relies principally upon *Carkonen v. Williams,* 76 Wn.2d 617, 458 P.2d 280 (1969). In *Carkonen* we defined the word levy solely when used in connection with the authority to tax. The court acknowledged that other meanings existed, but adopted a strict construction for the limited purpose of that case. We do not deem *Carkonen* as determinative of the meaning of the noun "levies" as used in the context of a constitutional amendment limiting property taxation.

█ It is well established that the word "levy" has a variety of meanings. As stated in *Plankinton v. Kieffer,* 70 S.D. 329, 333, 17 N.W.2d 494 (1945):

> It is also used indiscriminately to denote both the legislative function and the ministerial function of assessing, listing and extending taxes. . . . A mere levy, strictly speaking, does not create a valid tax against specific property. An assessment is also necessary to make complete and effective a "levy of taxes" *as the phrase is used and understood in its ordinary sense.*

(Italics ours.)

Other courts have also defined "levy" broadly:

"While the word 'levy' has various meanings, according to the connection in which it is used, when applied to taxation, it means the extension of the tax against the taxable property. A tax cannot be said to be levied until it is so extended."

*Syracuse Trust Co. v. Board of Supervisors,* 13 N.Y.S.2d 390, 394 (1939), *aff'd,* 258 App. Div. 17, 15 N.Y.S.2d 920 (1939).

"Levied" as applied to taxes is held to mean "the extension of taxes against taxable property."

*Paducah Cooperage Co. v. King Mill & Lumber Co.,* 227 Ky. 573, 577, 13 S.W.2d 778 (1929).

Levy is a synonym of assess.

*Texas Co. v. Fort,* 168 Tenn. 679, 683, 80 S.W.2d 658 (1935).

The word levy "is sometimes used, in the administrative sense, as referring to the mere ministerial or executive acts of ascertaining and entering taxes on the tax book and collecting them." . . . We construe Sec. 7.180 to use the term "levy" substantially in that sense.

*State v. Metropolitan St. Louis Sewer Dist.,* 365 Mo. 1, 13, 275 S.W.2d 225 (1955).

█ If the broad, nontechnical definition were adopted, the levy was not complete on December 7, 1972, since the assessor had not spread the levy on the books against specific property. The existence of broader definitions than that contended for by the state indicates that the intent of SJR 1 could well have been premised upon the belief that it would affect all taxes which had not been spread on the rolls. If December 7th were the controlling date, however, we point out the potentially paradoxical result that a county which had adopted its levy ordinance after December 7th would be subject to the limitation of SJR 1, while a county which passed its ordinance before that date would not.

Finding the language of SJR 1 to be unclear, we turn to the official voters' pamphlet for aid in interpretation. The ballot title speaks of replacing the present 40-mill limit

with a new provision under which the maximum allowable rate would be 1 percent of true and fair value. We find no mention in the text of SJR 1 or the official explanation thereof of the idea that no tax relief would be granted until 1974. There is not the slightest hint that a technical interpretation of the word levies would stand in the way of reduced taxes in 1973. Instead, the official statement for SJR 1 is couched in glowing terms of how much the taxpayer will save in regular property levies. It points out the extreme burden and hardship of property taxes which have more than doubled in the 5 years from 1966 to 1971. The reference to 1971 is highly significant; where is the warning that these taxes may be even higher in 1973? The final inspiration for an affirmative vote is this language: "Cast your vote on November 7 to protect your home, farm and business property from excessive taxation."

A conscientious voter who read every word of the text of SJR 1, the ballot title, the official explanation of the effect of the measure and the statement for the proposal would not find a whisper of suggestion that its impact would not be felt until 1974. We refuse to attribute to the average informed voter or even the better-than-average informed voter the legal theory that the proposed amendment hinged on the complex scheme of levying taxes in one year and collecting them in the next year, so that all taxes levied in 1972 were beyond the reach of SJR 1. If that was intended by the drafters of the measure, it would have been simple to say so.

We hold that SJR 1 applies to and sets the limits for the regular property taxes legislatively levied in 1972 and collectible in 1973.

Since we hold that SJR 1 is controlling as to said taxes collectible in 1973, regardless of when they were levied (whether in the legislative or administrative sense, or both), it is unnecessary to determine whether the effective date of SJR 1 was November 7, 1972, the date of its passage or December 7, 1972, after canvass by the Secretary of State and proclamation by the Governor.

Moving to Initiative 44, we note that the ballot title describes it as "An act to limit tax levies on real and personal property by the state, and other taxing districts, except port and power districts, to an aggregate of twenty (20) mills on assessed valuation . . ." The text of the proposal then sets forth the existing statutory scheme and concludes that

the aggregate of all tax levies upon real and personal property by the state, municipal corporations, taxing districts and governmental agencies, now existing or hereafter created, shall not exceed twenty mills on the dollar of assessed valuation, which assessed valuation shall be fifty percent of the true and fair value of such property in money.

The official explanation of the effect of Initiative 44 is that it is designed to *replace* the existing statutory limitation on millage which is described as 22 mills with respect to levies made in 1970 through 1972, and 21 mills for subsequent years. The statement for the initiative is that it is a "clean property tax measure. . . . The intent is to 'hold the line' on property taxes until a responsible constitutional limitation is adopted." It points out that there is no conflict between SJR 1 and Initiative 44: "Both are clean, no strings attached, property tax limit measures. . . . Passage of both is double insurance and is compatible."

Our comments about SJR 1 and the content of the voters' pamphlet are equally in point here. Again the possibility that the tax first due on April 30, 1974, is the subject of this "clean, hold the line" measure is so well obscured as to be invisible.

It is true that there is a single line reference under the heading of "the law as it now exists" which refers to a reduction to 20 mills with respect to *levies made in years subsequent to voter approval*. The meaning of this ambiguous language is entwined with the meaning of levy and levies, and is hardly fair or adequate warning of the result contended for by the state. Being placed under the heading of existing law and being side by side with the explanation

that Initiative 44 would replace this existing scheme, it does not justify the conclusion that the voters knowledgeably intended to delay applicability of the limitation until 1974. In fact, since that reference was under the heading of "the law as it now exists" the voter could well conclude that it was the very thing to be changed.

We hold that Initiative 44 is applicable to the taxes in question.

■ To understand the trial court's conclusion in holding that Initiative 44 and Laws of 1971, ch. 299, § 24 were both null and void, it is necessary to explore in detail the legislative and initiative actions. Initiative 44 was filed October 15, 1970 and certified to the legislature as of January 29, 1971, during its regular session. The seventh amendment to the constitution is explicit in its direction to the legislature as to an initiative: the legislature shall either enact or reject the measure before the end of the regular session. Here the legislature did neither. The constitution contemplates such inaction and requires the Secretary of State to submit the initiative to the people at the next regular general election. (Initiative 44 was submitted to the voters and approved at the November 7, 1972 general election and proclaimed by the Governor on December 7, 1972.) But the constitution does not stop there. It provides in effect that the legislature must not and cannot propose a different measure dealing with the same subject without submitting the alternative proposal to the people along with the people-originated initiative. Both Initiative 44 and section 24 expressly concern limitation of millage and the effective date of such limitation. Section 24 was not submitted to a vote of the people.

However, while both section 24 and Initiative 44 expressly concern limitation of millage, we do not agree with the trial court that both are null and void. To so hold would create in the legislature a veto power over every initiative. To so hold would turn the reserved initiative power of the people into a futile exercise.

To the extent that section 24 sets a millage limit in

excess of 20 mills, it must and does fail. It is apparent to us that the legislature was not endeavoring to subvert the initiative power of the people. Obviously it acted under a misconstruction of the effect of the initiative on taxes collectible in 1973.

■ However, we need not strike section 24 in its entirety for it contains also an allocation of millage, which the initiative does not contain. In that respect the two are not on the same subject. We note that Laws of 1971, 1st Ex. Sess., ch. 299, § 78, is a most comprehensive severance clause.[1] That clause allows us to rescue the millage allocation of section 24, a necessary and indispensable ingredient of our taxing scheme. We hold that the allocation of millage within section 24 is governing as follows:

|  | Incorporated Areas | Unincorporated Areas |
|---|---|---|
| State Public Assistance | 1.0 mill | 1.0 mill |
| State Levy for Schools | 2 | 2 |
| Local Schools | 6 | 6 |
| City | 8 (including ½ mill per RCW 41.16.060) | ... |
| County | 4 | 4 |
| County roads | 0 | 5 |
| Jr. taxing districts | 0 | 3 |
| Total | 21 mills | 21 mills |

Before proceeding to the question of how to deal with the excess mill, we point out that we agree with the trial court that Laws of 1971, 1st Ex. Sess., ch. 299, § 25, is valid and not in conflict with Initiative 44. The initiative set an overall limit on millage; it did not make any allocation. While section 25 results in a millage in excess of 20 mills, that is a

[1] Laws of 1971, 1st Ex. Sess., ch. 299, § 78:

"If any phrase, clause, subsection or section of this 1971 amendatory act shall be declared unconstitutional or invalid by any court of competent jurisdiction, it shall be conclusively presumed that the legislature would have enacted this 1971 amendatory act without the phrase, clause, subsection or section so held unconstitutional or invalid and the remainder of the act shall not be affected as a result of said part being held unconstitutional or invalid."

separate problem; the same thing could be said for any part of a millage allocation. Each component goes to make up the total which happens to be 1 mill more than is permissible. Our holding is that Initiative 44 set a maximum millage of 20 mills and we must determine how to trim the extra mill allocated by section 24.

At the outset we reject the suggestion by the state that finding the King County levy to be in excess of that allowable invalidates the entire levy. We adopt the theory of those authorities which only void the excess while confirming the levy millage to the allowable maximum. *See People ex rel. Ryan v. Illinois Cent. R.R.*, 273 Ill. 541, 113 N.E. 145 (1916).

The question of where and how to cut the excess of 1 mill is extraordinarily difficult. The parties have advanced complex solutions. For example, the state acknowledges that 1 mill of the state levy for public assistance (out of a 2 mill levy) must fail. We agree that section 24 specifically so provides. The state next suggests, however, that the total millage for schools was intended to be 7 mills (5 local and 2 state), but we read the statute to allocate 6 mills to the local school levy. Others want the matter returned to the county council for reconsideration. To do that would complicate further an already almost insoluble state of affairs.

Instead we look to RCW 84.52.010, just as did the trial court. It provides in part:

That when any such county assessor shall find that the aggregate rate of levy on any property will exceed the limitation set forth in RCW 84.52.050 as now or hereafter amended, he shall *recompute* and establish a consolidated levy in the following manner:

(1) He shall include for extension on the tax rolls the full rates of levy certified to him for state, county, county road districts, city and school district purposes in amounts *not exceeding the limitations established by law*

. . .

(2) He shall include for extension on the tax rolls the rates percent of the tax levies certified to him by all other taxing districts imposing taxes on such property, other than port districts and public utility districts, re-

duced by him in such uniform percentages as will bring the consolidated tax levy on such property within the provisions of such limitation.

(Italics ours.)

The state argues that the provisions of subdivision (1) cannot apply because no one of the component districts specified exceeds the limitations established by law. The problem is that they do cumulatively. We cannot believe that the legislature intended that the assessor had no authority. Instead, the legislature specifically orders the assessor to *recompute* and establish a consolidated levy not exceeding the limitations established by law. We interpret that to mean that the assessor is to reduce all of the component levies in uniform percentages, both in incorporated and unincorporated areas. To hold otherwise would result in an absurd, unfair penalty to particular districts. For example, in unincorporated areas, the entire 1 mill would come from the junior taxing districts, representing one-third of their cumulative allocation. Likewise, if each is reduced by exactly the same percentage, it obviously extracts an unequal penalty. Instead, we hold that RCW 84.52.010 requires that each component unit be reduced by the percentage that its allocation bears to the total millage.

The state next asserts that the proposed King County millage of 22.6 mills, based on local assessed values, does not exceed 20 mills at 50 percent of true and fair value. This conclusion follows from the state's determination that the average actual ratio or level of assessed value to actual value of property indicates a county valuation at less than true and fair value. The state's second premise is that if one part of the formula (valuation) is too low, the other element (millage) can exceed the legal limit so that the end product is equivalent to or less than 20 mills times 50 percent of true and fair value.

This theory has long been with us. It is rejected as to all levies, save those for state purposes, on several grounds First, statutorily, the power of the State of Washington through its Department of Revenue, to use its equalized

valuation is limited to implementation of the state statutory property tax levy. RCW 84.48.080.

Second, by prior decision of this court, the state's equalized values cannot be used for the levy of local purpose taxes. *Clark v. Seiber*, 48 Wn.2d 783, 296 P.2d 680 (1956).

It follows that the state's position is correct only as to the state property tax levy where it is authorized to base its levy on the state equalized value. *State ex rel. Showalter v. Cook*, 175 Wash. 364, 27 P.2d 1075 (1933). To the extent that the state levy, based on equalized values, causes the total millage based on local values to exceed 20 mills, it is valid.

Intervenors Scoones carry this point to its succeeding complication, however. They point out that their property was valued at 50 percent of true and fair value as confirmed by the Board of Tax Appeals. From that fact they contend that the application of the state levy, based on averaging variable assessed values in King County, to their fully valued property results in a total levy actually in excess of the constitutional limit. In other words, if their property is fully assessed at 50 percent of its true and fair value, any millage at the inflated state ratio value necessarily exceeds the constitutional limit. This is an issue of substantial consequence, but one upon which we cannot rule in this case. The intervenors concede that their intervention was granted upon the express condition that they were precluded from raising this very contention. Because of this limitation, the briefs of other parties have only touched on this point. Under such circumstances, it cannot be reviewed.

Finally, we acknowledge and agree with the assertion by the state that a decision along the lines hereof raises difficult and complex issues which necessarily follow this determination. We cannot and do not agree with the second proposition of the state that this complexity requires this court to indulge in every presumption to uphold the levies at the higher level. To do so would thwart the expressed intent of the voters to limit property taxes and now.

The order and judgment of the trial court is affirmed in part and reversed in part, to the extent it is inconsistent with our holdings herein.

HALE, C.J., FINLEY, ROSELLINI, and WRIGHT, JJ., and RUMMEL, J. Pro Tem., concur.

APPENDIX
The complete text of Initiative Measure No. 44 follows:
"BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF WASHINGTON:
"Section 1. Section 84.52.050, chapter 15, Laws of 1961 as last amended by section 5, chapter 92, Laws of 1970, 2nd Ex. Sess. and RCW 84.52.050 which read as follows:

"Except as hereinafter provided, the aggregate of all tax levies upon real and personal property by the state, municipal corporations, taxing districts and governmental agencies, now existing or hereafter created, shall not exceed twenty-two mills on the dollar of assessed valuation with respect to levies made in 1970 and twenty-one mills on the dollar of assessed valuation with respect to levies made in subsequent years, which assessed valuation shall be fifty percent of the true and fair value of such property in money: PROVIDED, That if an amendment to Article VII, section 2 of the state Constitution, as amended by Amendment 17, imposing a limit on property taxes of, in effect, one percent of the true and fair value of property is approved by the voters, such aggregate of all tax levies shall not exceed twenty mills on the dollar of assessed valuation with respect to levies made in years subsequent to such voter approval; and within and subject to the aforesaid limitation the levy by the state shall not exceed two mills to be used exclusively for the public assistance program of the state and the levy by any county shall not exceed four mills: PROVIDED, That if such constitutional amendment is so approved, the authority of the state to levy not to exceed two mills to be used exclusively for the public assistance program of the state shall be reduced to not to exceed one mill; and upon and after the effective date of the provisions of chapter 262, Laws of 1969 ex. sess., which impose a tax upon net income, such authority of the state shall expire and the levy by any county may exceed four mills but shall not exceed five mills; the levy by or for any school district shall not exceed seven mills: PROVIDED, That in each of the years 1967 and 1968 and 1969 and 1970 the state shall levy a property tax of four mills of which two mills shall be used exclusively for the public assistance program of the state and of which two mills shall be used exclusively for the support of the common schools; and in such years in which the state shall validly levy a property tax of two mills for the support of the common schools, the levy by or for any school district shall not exceed six mills: PROVIDED FURTHER, That the levy by or for any union high school district shall not exceed two-fifths of the maximum levy permissible for any school district without a vote of the electors thereof and the levy by or for any component district within a

union high school district shall not exceed three-fifths of the maximum levy permissible for any school district without a vote of the electors thereof: PROVIDED FURTHER, That the levy against any nonhigh school district for the high school district fund shall not exceed two-fifths of the maximum levy permissible for any school district without a vote of the electors thereof and the levy by or for any such nonhigh school district shall not exceed the balance of such maximum permissible levy; the levy for any road district shall not exceed five mills; and the levy by or for any city or town shall not exceed seven and one-half mills: PROVIDED FURTHER, That counties of the fifth class and under are hereby authorized to levy from four to five and one-half mills for general county purposes and from three and one-half to five mills for county road purposes if the total levy for both purposes does not exceed nine mills: PROVIDED FURTHER, That counties of the fourth and the ninth class are hereby authorized to levy four and one-half mills until such time as the junior taxing agencies are utilizing all the millage available to them.

"Nothing herein shall prevent levies at the rates provided by existing law by or for any port or power district.

"are each amended to read as follows:

" 'Except as hereinafter provided, the aggregate of all tax levies upon real and personal property by the state, municipal corporations, taxing districts and governmental agencies, now existing or hereafter created, shall not exceed twenty mills on the dollar of assessed valuation, which assessed valuation shall be fifty percent of the true and fair value of such property in money.

" 'Nothing herein contained shall prohibit the legislature from allocating or reallocating up to twenty mills between the taxing districts of the state and its political subdivisions and nothing herein contained shall prevent levies at the rates provided by existing law by or for any port or power district.' "

The complete text of Senate Joint Resolution 1 follows:

"BE IT RESOLVED, By the Senate and House of Representatives of the State of Washington, in Legislative Session Assembled:

"THAT, At the next general election to be held in this state, there shall be submitted to the qualified electors of the state for their approval and ratification, or rejection, an amendment to Article VII of the Constitution of the State of Washington by amending section 2, (Amendment 17) to read as follows:

"Article VII, section 2. Except as hereinafter provided and notwithstanding any other provision of this Constitution, the aggregate of all tax levies upon real and personal property by the state and all taxing districts now existing or hereafter created, shall not in any year exceed ((forty mills on the dollar of assessed valuation, which assessed valuation shall be fifty))* one per centum of the true and fair value of such property in money: PROVIDED, HOWEVER, That nothing herein shall prevent levies at the rates now provided by law by or for any port or public utility district. The term "taxing district" for the purposes of

---

*Italicized material deleted.

this section shall mean any political subdivision, municipal corporation, district, or other governmental agency authorized by law to levy, or have levied for it, ad valorem taxes on property, other than a port or public utility district. Such aggregate limitation or any specific limitation imposed by law in conformity therewith may be exceeded only

"(a) By any taxing district when specifically authorized so to do by a majority of at least three-fifths of the electors thereof voting on the proposition to levy such additional tax submitted not more than twelve months prior to the date on which the proposed levy is to be made and not oftener than twice in such twelve month period, either at a special election or at the regular election of such taxing district, at which election the number of persons voting on the proposition shall constitute not less than forty per centum of the total number of votes cast in such taxing district at the last preceding general election;

"(b) By any taxing district otherwise authorized by law to issue general obligation bonds for capital purposes, for the sole purpose of making the required payments of principal and interest on general obligation bonds issued solely for capital purposes, other than the replacement of equipment, when authorized so to do by a majority of at least three-fifths of the electors thereof voting on the proposition to issue such bonds and to pay the principal and interest thereon by an annual tax levy in excess of the limitation herein provided during the term of such bonds, submitted not oftener than twice in any calendar year, at an election held in the manner provided by law for bond elections in such taxing district, at which election the total number of persons voting on the proposition shall constitute not less than forty per centum of the total number of votes cast in such taxing district at the last preceding general election: PROVIDED, That any such taxing district shall have the right by vote of its governing body to refund any general obligation bonds of said district issued for capital purposes only, and to provide for the interest thereon and amortization thereof by annual levies in excess of the tax limitation provided for herein, AND PROVIDED FURTHER, That the provisions of this section shall also be subject to the limitations contained in Article VIII, section 6, of this Constitution;

"(c) By the state or any taxing district for the purpose of paying the principal or interest on general obligation bonds outstanding on December 6, 1934; or for the purpose of preventing the impairment of the obligation of a contract when ordered so to do by a court of last resort.

"AND BE IT FURTHER RESOLVED, That the secretary of state shall cause notice of the foregoing constitutional amendment to be published at least four times during the four weeks next preceding the election in every legal newspaper in the state."

UTTER, J. (dissenting)—The conclusion that tax relief measures are not immediately effective is an unpopular one. I believe, however, no other conclusion should be reached.

The result of the majority opinion is to invalidate levies passed in 37 counties of this state, in what must have been reliance on the language of the acts in question and our previous cases.

The majority concludes the word "levy" applies to the collection of taxes, but to do so they are forced to interpret the unambiguous use of the word "levy" as it relates to RCW 84.52. They also fail to explain why *Carkonen v. Williams,* 76 Wn.2d 617, 627, 458 P.2d 280 (1969) is not controlling on this issue.

A 21-mill limitation is produced without explanation of where this is found in section 24 or 25 of chapter 299, Laws of 1971, 1st Ex. Sess. If, in fact, Initiative 44 with its 20-mill limit amends section 24, then we should logically be compelled to assume section 24 could not then, in some fashion, still validly authorize 21 mills. No explanation is given for the contrary conclusion.

Finally, even if this millage allocation can somehow be found, the majority uses the wrong statute to authorize an assessor to modify the legislative enactment of the county council, thereby violating the separation of powers doctrine basic to our form of government.

This case involves an effort by the Washington State Department of Revenue to obtain a writ of prohibition against the King County Assessor to restrain him from extending the King County Council tax levy at millage rates less than necessary to raise amounts certified under the county ordinances. The essential question is what is the applicable mill limit governing the ordinance levies in this case, a figure to be determined by deciding which of a number of pertinent laws apply.

The majority holds the 20-mill limitation of SJR 1 and Initiative 44 applies to taxes "collectible in 1973, regardless of when they were levied"; that the allocation portion of sections 24 and 25, chapter 299, Laws of 1971, 1st Ex. Sess. is valid and provides for 21 mills; and, that the excess millage in the county ordinances is to be cut pursuant to

RCW 84.52.010, which instructs the assessors in situations of excessive aggregate levy rates.

I cannot agree with these conclusions and believe they are arrived at by inappropriate analysis.

I believe the assessor is required to extend the 1972 levies on the tax rolls pursuant to the 1972 King County ordinances because the ordinance levies were enacted prior to the effective date of either SJR 1 or Initiative 44, and therefore do not exceed any constitutional or statutory limitations. However, if any excess is found, as the majority finds, the county ordinances are a nullity and new levies must be enacted.

My first departure from the majority is with their definition of what the millage rate is for taxes "for collection in the calendar year 1973". In determining which laws apply, the meaning of the word "levy" as used in the context of this case is critical. To include within the expression of the basic issue of this case, a conclusion that "levy" is to mean the "collection" and not the legislative act alone, assumes the question to be answered.

The appellant-Department of Revenue asserts "levy" means the exercise of a legislative function, undertaken here by the county council and that the levies in this case were made at the passage of the county ordinances establishing the 1972 levy, regardless of any subsequent duties the county assessor must perform. The cross-appellants assert that the levy process includes the assessor's duties and thus at the effective dates of SJR 1 or Initiative 44, whatever they might be, the levy had yet to be completed.

We have long recognized that the word "levy" is subject to various meanings. *Hays v. Miller,* 1 Wash. Terr. 143, 147 (1861); *Carkonen v. Williams, supra.* In resolving other issues we have recognized that usage of the word "levy" may indicate the legislative function of imposing a tax, as well as the administrative assessing or extending of the tax. *Dore v. Kinnear,* 79 Wn.2d 755, 758, 489 P.2d 898 (1971); *State ex rel. Morgan v. Kinnear,* 80 Wn.2d 400, 494 P.2d 1362 (1972).

Given our recognition in this state that the word "levy" may receive numerous usages depending upon the meaning to be conveyed, no resort to outside authority is needed.[2] The critical error by the majority, however, is not their source, but their purpose. The cases used do demonstrate the word "levy" is subject to numerous meanings, but they do not support a conclusion that the word is ambiguous when used in the context now before us. The mere fact a word may receive multiple meanings does not mean it is ambiguous when used in a particular context and the majority has failed to demonstrate any ambiguity of "levy" here. In this case, the word "levy" is not ambiguous and the majority need not search the legislative history resource of the voters' pamphlet, explaining SJR 1 and Initiative 44, to clarify its meaning. *Spokane v. State*, 198 Wash. 682, 691, 89 P.2d 826 (1939); *State v. Coma*, 69 Wn.2d 177, 182, 417 P.2d 853 (1966).

The voters' pamphlet may be referred to in an effort to determine the general intent of the voters but it fails to provide any justification for altering the meaning to be given "levy" operating in the context of SJR 1, Initiative 44, and RCW 84.52. The majority recites extensively from the pamphlet but fails to show any particular language bearing directly on the meaning of "levy". Rather, all that can be concluded from a reading of the pamphlet is that the voters intended both SJR 1 and Initiative 44 take effect at the next "levy". To construe "levy" to refer to the administrative duties of collection and not the legislative act of enacting the levy is arbitrary and without logical explanation.

Rather than surmising a meaning for "levy" from the voters' pamphlet, we must search its usage in those laws in which it is here to operate (RCW 84.52) and refer to our case law rulings. The majority fails to recognize that Initia-

---

[2]Furthermore, despite the references to the numerous meanings for "levy", the cases cited in most instances concluded the legislative function meaning for "levy" was necessary in the context of these cases.

tive 44 is an amendment to RCW 84.52 and must be understood in that context.

In *Carkonen*, at 627, we defined the word "levy" as the "exercise of a legislative function, whether state or local, which determines that a tax shall be imposed, and fixes the amount, purpose, and subject of the exaction. 3 T. Cooley, Taxation § 1012, at 2043-44 (4th ed. 1924)." This definition was held applicable when the issue of the case involved the authority to tax. The legislative function definition for "levy" had been previously recognized. *Wingate v. Ketner*, 8 Wash. 94, 35 P. 591 (1894); *New Seattle Chamber of Commerce v. Seattle*, 88 Wash. 620, 623, 153 P. 351 (1915); *Hillier v. PUD 3*, 188 Wash. 602, 608, 63 P.2d 392 (1936).

Our analysis in *Carkonen* is controlling here because the use of "levy" within the texts of laws establishing millage limitation, as well as its use in RCW 84.52, refers to the taxation authority and its limits. Yet, the majority summarily rejects *Carkonen* without any explanation whatsoever. This rejection is especially unfounded and erroneous after reviewing RCW 84.52.

RCW 84.52 is titled Levy of Taxes and sets forth the rules and procedures by which the legislative function of enacting tax levies is to be undertaken. This chapter is to be compared to RCW 84.56, which is titled Collection of Taxes and sets forth the duties of the administration of tax levies by assessors and other administrators. Millage limitations of tax levies (SJR 1) are referred to and operate in RCW 84.52, and Initiative 44 amends this chapter.

The definition section for RCW 84.52 defines "regular property tax levy" as being made "by or for a taxing district" whose levy is subject to the mill limitation. RCW 84.04.140. A "taxing district" includes "the state and any county, city, town . . . having the power or authorized by law to impose burdens upon property . . . for the purpose of obtaining revenue . . ." RCW 84.04.120. Thus, the "regular property tax levy" is imposed by a taxing district such as King County in its legislative authority.

A reading of the provisions in RCW 84.52 for references to the council and assessor, compels the conclusion of legislative usage of "levy" in this case.

RCW 84.52.010 opens the chapter with the statement "taxes shall be levied or voted" whereas it states the assessor is to determine, calculate and fix the rate percent in accordance with the "levy" previously voted by the legislative body. RCW 84.52.030 establishes the time a levy is to be made and places date limits for such enactment on "the board of county commissioners of each county . . . and all other officials or boards authorized by law to levy taxes . . ." Again, the legislative function meaning of "levy" is clear in this context and it is in this context we must deal. RCW 84.52.050 places millage limitations on "all tax levies . . . by . . . taxing districts . . ."

RCW 84.52.070 and .080 further reveal the respective aspects of the "levying process", and that "levy" in this case means the legislative aspect. Section .070 places a duty on "the board of county commissioners . . . of city councils . . . and of all officials or boards of taxing districts . . . to certify to the county assessor . . . the amount of taxes levied . . ." Section .080, on the other hand, establishes the form by which the assessor "shall extend the taxes upon the tax rolls" in a manner "to raise the amounts of taxes levied . . ."

The majority avoids any analysis of this context in which "levy" is to operate and fails to explain why it refuses to employ *Carkonen* or review RCW 84.52. Rather than exercise this basic step in providing an accurate meaning to "levy" as used, the majority decides to elicit a meaning for the word from the general language of the voters' pamphlet, and begins its review without demonstrating any ambiguity of the word "levy" as used here.

The keystone of the majority opinion is its definition of the term "levy". Inasmuch as this is incorrect, the rest of their opinion which is premised on their definition of levy is also incorrect.

The assessor's levy duties occurred here after the alleged

effective dates of SJR 1 and Initiative 44. The effective dates of SJR 1 and Initiative 44 are both December 7, 1972 and not on election day, November 7, 1972.

All parties agree Initiative 44 is effective December 7, 1972 because Const. art. 2, § 1(d) (amendment 7) provides such initiative measures shall be operative on the thirtieth day after the election of its approval. That date is December 7, 1972, the date of the Governor's proclamation and the Secretary of State's canvass.

The effective date of the constitutional amendment, SJR 1, is governed by Const. art. 23, § 1 (amendment 37) which provides in part:

> and *if* the people approve and ratify such amendment or amendments, *by a majority* of the electors voting thereon, the same shall become part of this Constitution, and *proclamation* thereof shall be made by the governor . . .

(Italics mine.) No effective date is set forth in amendment 37 for constitutional amendments, unlike the provisions of amendment 7, relating to initiatives.

This omission, however, does not defeat the strong inference to be drawn from the provision references to the necessity for a majority approval and a Governor's proclamation. That inference, I believe, is that a constitutional amendment is only effective after an accurate and lawful determination that the voters did indeed approve the amendment. The legislature has specified a process by which such a validation is to occur. In RCW 29.62.130 it states the Secretary of State must "within thirty days after any such election" canvass the votes and certify the results to the Governor "and the governor shall forthwith issue his proclamation . . . declaring the result . . ."

*State ex rel. Wash. State Sportsmen's Council, Inc. v. Coe*, 49 Wn.2d 849, 851, 307 P.2d 279 (1957), where we stated the thirtieth amendment to our constitution became effective on the date of the Governor's proclamation of voter approval, supports this conclusion.

The Governor does not have the power to defeat the

declared and certified will of the people by failing to proclaim the result as required by statute and the constitution. Rather, the effective date of an amendment must be measured by the date of that proclamation, when it is exercised in accordance with the law and dependent upon the canvass and certification of the people's vote. To hold otherwise would ignore the canvassing process required by statute and would violate a cardinal rule of constitutional construction, as stated in Const. art. 1, § 29: "The provisions of this Constitution are mandatory, unless by express words they are declared to be otherwise." *State ex rel. Smith v. Neal,* 25 Wash. 264, 265, 65 P. 188 (1901); *State ex rel. Lemon v. Langlie,* 45 Wn.2d 82, 97, 273 P.2d 464 (1954); *State ex rel. Toll Bridge Authority v. Yelle,* 61 Wn.2d 28, 65, 377 P.2d 466 (1962) (Donworth, J., dissenting).

SJR 1 became part of our constitution upon the date the official canvass of the returns certified that it had been approved. It is this date amendment 37 requires by its reference to the Governor's proclamation which must follow the statutory certification. In this case, that date would be December 7, 1972, as there is no constitutional or statutory instruction to relate the amendment's effectiveness back to the date of the election.

Although SJR 1 and Initiative 44 are not applicable to the King County levy ordinances of this case, in my opinion, the validity of Initiative 44 is consequential as it affects the validity of sections 24 and 25 of chapter 299, Laws of 1971. I agree with the majority's conclusion that the trial court erred in declaring both invalid because of the legislature's failure to submit section 24 to the voters with Initiative 44 as required by Const. art. 2, § 1(a) (amendment 7). However, I strongly object to the majority's summary and unsupported conclusion that the "millage allocation of section 24" is rescued by the comprehensive severance clause of chapter 299 in such a fashion as to provide for the allocation set forth in the opinion.

Section 24 provides millage allocation for 1970, 1971, 1972, 1973, and subsequent years, and does so with exten-

sive provisos. Yet, the majority fails to explain what millage allocation of this section, and section 25, provides the particular allocation it sets forth. If Initiative 44 with its 20-mill limit amends section 24, how can the majority conclude section 24 produces a 21-mill allocation?

It is a disservice to the majority's own conclusion to fail to explain how the allocation was derived from section 24. The mathematical variations within section 24 place the majority result, absent explanation, in a zone of arbitrary legislating, undeserving of our decision making, with no guide to the future cases on this subject as to how this result was reached.

Assuming the majority's summary allocation of 21 mills is accurate, the King County Council levy ordinances contain an excess of 1 mill. The majority relies upon RCW 84.52.010 as the means of cutting that mill, which they interpret as instructing the assessor to reduce any excess in a uniform percentage.

I disagree with this method of cutting any excess millage of the legislative enactment for I fail to see how RCW 84.52.010 authorizes such a procedure. This statutory provision only permits the assessor to "recompute and establish a consolidated levy" where the "aggregate *rate of levy* on any property will exceed the limitation . . ." (Italics mine.) The "rate of levy" refers to the rate percent calculated and fixed by the assessor upon the assessed valuation of the county property and does not refer to any excess in the legislative levy. In cases where the legislative enactment violates constitutional or statutory limitations, it must be struck down in toto. To permit an assessor to modify ordinances violates our separation of powers and our understanding of the duties set out for the assessor (RCW 84.56) as compared to those established for the taxing authorities (RCW 84.52).

Thus, it is consistent with the whole taxing process presented in RCW 84.52 and 84.56 to permit the assessor to recompute where his or her rate percentages aggregately exceed the limitations of law. However, to permit such cut-

ting where the excesses are those of the legislature, cannot be supported by RCW 84.52.010 or any other statutory authorization brought to this court's attention. The majority rejects this method of dealing with legislative excesses by merely alleging it "would complicate [affairs] further."

I would reverse the trial court as I find the pertinent county ordinances enacted and effective prior to the effective dates of SJR 1 and Initiative 44, and violative of no millage limitations. The majority only achieves its conclusion of a 20-mill limitation by rejecting the unambiguous meaning of the word "levy" in its use here for one which creates great confusion, not only now but for the future, in our tax scheme; by magically producing a 21-mill allocation from section 24 without explanation; and, by permitting the administrative rewriting of legislation in order to shape a levy to new millage limits. I would grant the state its writ of prohibition.

HUNTER and HAMILTON, JJ., concur with UTTER, J.

Petition for rehearing denied August 31, 1973.