[No. 54765-3.   En Banc.   July 14, 1988.]

THE CITY OF SPOKANE, *Respondent,* v. THE TAXPAYERS OF THE CITY OF SPOKANE, ET AL, *Appellants.*

*Richard P. Guy, Robert H. Whaley,* and *Winston & Cashatt,* for appellants Taxpayers, et al.

*Powell & Morris, P.S.,* by *William J. Powell,* for appellants Citizens for Clean Air, et al.

*Preston, Thorgrimson, Ellis & Holman,* by *Thomas F. Kingen* and *James C. Sloane, City Attorney,* for respondent.

DOLLIVER, J.—The City of Spokane filed a class action against the City's taxpayers, ratepayers and electors, seeking a declaratory judgment that it had authority to proceed with the construction of a solid waste disposal facility. The trial court issued a partial summary judgment upholding Spokane's authority to proceed with the project without obtaining voter approval. We granted direct review.

The facts are largely undisputed. The City and County of Spokane recognized their four landfills were becoming insufficient to process their solid waste. In 1981, they began investigating the feasibility of a so–called "waste–to–energy facility", that is, a facility which would incinerate the county's garbage while simultaneously producing energy as a by–product.

In 1983 and 1984, an "Update" to Spokane's solid waste management plan was prepared. Public hearings were held on the merits of the Update in December 1983 and October 1984. The Update called for construction of a "mass burn" waste–to–energy facility and transfer stations. The process of using landfills would be continued to a limited extent.

On December 17, 1984, the Spokane City Council adopted an ordinance establishing a plan for construction of the Spokane Regional Solid Waste Disposal Facility. Spokane Ordinance C–27797 (the Note Ordinance). Although the Note Ordinance did not specify the plan being adopted was that presented in the Update, the Update was officially adopted the next day by resolution. The Note Ordinance also authorized the issuance and sale of $50 million in Project Notes to Rainier National Bank. By the Note Ordinance, the City pledged to issue revenue bonds in order to generate some of the funds for repayment of the notes. The notes were intended only as a temporary financing tool until the revenue bonds were issued. By virtue of this arrangement with Rainier, the City was able to gain certain temporary tax advantages. The Note Ordinance estimated the cost of building the facility at $100 million.

Numerous committees worked on implementing these plans for the next few years. Public meetings were held which included input from the area's citizens. The City and County of Spokane entered into a series of "Interlocal Agreements" in order to establish the project's organizational structure and funding participation among the various local governments involved in the regional plan. An environmental impact statement was drawn up and

approved. Contracts were negotiated with Puget Sound Power and Light for the sale and transmission of the project's electrical output. In November 1986, the City Council approved acceptance of a $60 million grant from the Department of Ecology to help fund the project's design and construction. Under the grant, DOE would provide 50 percent matching funds for the project. The remainder of the funds was to come initially from the note proceeds and later from the revenue bond proceeds.

The process for selecting a vendor to construct and operate the facility began in March 1986. Ultimately, four companies submitted proposals for the design, construction, and operation of the facility in March 1987. The City and County determined in May that Signal Environmental Systems (later known as Wheelabrator Environmental Systems) was best qualified for the project.

The project met with some opposition in the community. As part of the opposition, the Citizens for Clean Air, a nonprofit corporation, sponsored an initiative calling for an amendment to the city charter which would require voter approval "for capital expenditures . . . requiring indebtedness of the taxpayers and property owners for capital projects . . . including the proposed mass burn plant for refuse disposal (Waste to Energy Plant)." The initiative was filed on September 3 and was placed on the November 3 ballot.

In response to the filing of this initiative, the City began this declaratory action on October 6. Named as defendants were Spokane's taxpayers, the ratepayers of the City's refuse utility, and the City's qualified and registered electors. In its suit, the City sought a declaratory judgment that the initiative did not apply to the waste–to–energy project and that the City Council could proceed with the issuance and sale of the revenue bonds.

Public hearings on the Wheelabrator contracts were held on October 26 and November 2. At the conclusion of the last meeting, at 1:45 a.m. on November 3, the City and County authorized execution of the Wheelabrator contracts. The contracts were signed at 2 a.m.

Later that day, Spokane's voters passed the initiative with a majority vote of approximately 70 percent. On November 23, the City Council adopted an ordinance authorizing the issuance of $100 million in revenue bonds for the project. Despite this authorization, the bonds have not yet been issued because the current dispute prevented the City's bond attorney from being able to render an opinion as to the bonds' validity.

In the declaratory action, the trial court certified the class of taxpayers, ratepayers, and electors of the City of Spokane. In the interest of simplicity, we will refer to the defendant class as "the taxpayers". The trial court granted leave to intervene to the group which sponsored the initiative, Citizens for Clean Air. Spokane moved for partial summary judgment. The trial court granted the motion, concluding that since the charter amendment did not apply to the project, the City Council did not need to obtain voter approval before proceeding with the project. The trial court also concluded application of the ordinance to the project would unconstitutionally impair the City's contract with DOE. The defendants sought direct review in this court, which was granted.

Before reaching the merits of the case, we must determine two preliminary matters. First, whether the City's action against the ratepayers and electors constituted a "justiciable controversy". The appellants argue no justiciable controversy exists with respect to the ratepayers and electors and seek to have these classes decertified and the relief against them dismissed. They assert it would be wrong to bind the ratepayers and electors to the decision reached in this case.

The appellants concede a justiciable controversy exists with respect to the taxpayers. Under RCW 7.25, a city may initiate a declaratory judgment action against its taxpayers in order to determine the validity of a bond issue. RCW 7.25.010, .020. This would appear to be a determination such actions would constitute a justiciable controversy. The parties have all treated the statute in this manner.

■ Assuming a justiciable controversy exists as to the taxpayers, there is no reason to hold differently as to the ratepayers and electors. A justiciable controversy is one involving: (1) an "actual, present and existing dispute"; (2) parties with "genuine and opposing interests"; (3) interests that are "direct and substantial"; and (4) a "final and conclusive" judicial determination. *Diversified Indus. Dev. Corp. v. Ripley,* 82 Wn.2d 811, 815, 514 P.2d 137 (1973). Indeed, these requirements are more clearly met with regard to the ratepayers and electors than with regard to the taxpayers. It was the electors who approved the initiative ordinance which forms the basis for this action, and it is the ratepayers who would ultimately pay the bills for the new facility. We hold a justiciable controversy exists as to the ratepayers and electors.

■ The second preliminary matter is appellants' argument, citing *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 86 L. Ed. 2d 628, 105 S. Ct. 2965 (1985), that allowing judgment to be entered against the ratepayers and electors would violate due process. Appellants evidently contend, by the reference to *Phillips,* that the ratepayers and electors did not receive sufficient notice of the action. They have not supported this reference with any argument. Notice must be reasonably calculated, under the circumstances, to inform recipients of the pendency of the action. *Phillips Petroleum Co. v. Shutts, supra* at 812. The City apparently mailed a notice of this action with every utility bill it sent in November. The notice was addressed to all taxpayers, ratepayers, and electors of the City of Spokane. No party to this appeal has argued if this constitutes sufficient notice to all the defendant classes. This court has no way of knowing, for example, the extent to which each class overlaps with the others. Constitutional arguments should not be addressed when they have not been adequately briefed. *E.g., Meyer v. UW,* 105 Wn.2d 847, 855, 719 P.2d 98 (1986). That is certainly the case here and we refuse to consider the alleged violation of due process.

The primary issue before us is whether the initiative ordinance applies to the waste–to–energy project. We hold it does not.

The controlling provision of the initiative ordinance reads as follows:

> That the city charter of the City of Spokane be amended to provide that *a vote of the people be required for capital expenditures* (excepting that no vote of the people shall be required for expenditures to provide for the necessary and legitimate expenses of the city, including maintenance and operation of existing facilities, assessments for construction of storm sewers, sanitary sewers, landfills, water mains and trunklines, street maintenance and construction, resurfacing streets, snow and ice control, and/or expenditures of an emergency nature) *requiring indebtedness of the taxpayers and property owners for capital projects, including the proposed mass burn plant for refuse disposal (Waste to Energy Plant).*

(Italics ours.) The ballot proposition summarized the initiative in this fashion:

> Shall the Charter of the City of Spokane be amended to require a vote of the people for capital expenditures which would result in indebtedness of the city taxpayers and property owners through the issuance of bonds as provided in Initiative Ordinance No. C–28871?

■■ Initiatives are to be interpreted according to the general rules of statutory construction. *Hi–Starr, Inc. v. Liquor Control Bd.,* 106 Wn.2d 455, 460, 722 P.2d 808 (1986); *Department of Rev. v. Hoppe,* 82 Wn.2d 549, 552, 512 P.2d 1094 (1973). Statutory language must be given its usual and ordinary meaning, regardless of the policy behind the enactment. *Department of Rev. v. Hoppe, supra* at 552. Judicial interpretation should focus on the voters' intent and the language of the initiative "as the average informed lay voter would read it.'" *Estate of Turner v. Department of Rev.,* 106 Wn.2d 649, 654, 724 P.2d 1013 (1986) (quoting *In re Estate of Hitchman,* 100 Wn.2d 464, 467, 670 P.2d 655 (1983)). In determining voters' intent, courts should not

read into an initiative "technical and debatable legal distinction[s]" not apparent to the average informed lay voter. *In re Estate of Hitchman,* at 469. However, if the general rules of statutory construction are to be followed, the intent behind the language of an enactment becomes relevant only if there is some ambiguity in that language. *E.g., State v. Johnson,* 104 Wn.2d 179, 181, 703 P.2d 1052 (1985).

The taxpayers argue the reference in the initiative ordinance to the waste–to–energy plant indicates the people intended capital expenditures for that plant to require voter approval. The City contends the initiative ordinance applies only to capital expenditures which require indebtedness of the taxpayers, and that neither the bond issuance nor the Wheelabrator contract trigger such indebtedness. The trial court agreed with the City's position.

■ The City is correct in its analysis that the project will not create indebtedness for the taxpayers. Both the ordinance adopted in November 1987 authorizing issuance of the bonds and the 1984 Note Ordinance provide repayment of the City's obligations will not come from general taxes, but rather from specific sources such as revenues of the solid waste disposal system. Wheelabrator is to be paid for its construction work from the bond revenues and the DOE grant. Wheelabrator is to be paid for its work in maintaining and operating the facility from revenues ("tipping fees") generated by the facility's operation. None of these involve payment from Spokane's general tax revenues. In the words of the trial court:

> Issuing revenue bonds creates no new indebtedness and is not, in and of itself, a capital expenditure. Revenue bonds will not be repaid from property taxes, nor will they be an indebtedness of the City. . . . The bonds will be repaid from refuse utility fees charged.

We have recognized the difference between indebtedness which obligates the taxpayers and property owners and that which obligates a special fund. Payments from special revenue funds are not general obligations of the City. *See Metropolitan Seattle v. Seattle,* 57 Wn.2d 446, 458–59, 357

P.2d 863 (1960); *Winston v. Spokane,* 12 Wash. 524, 41 P. 888 (1895). The obligations on Spokane's citizens are for paying fees for using the services of the utility. Such fees are not a tax. *Twitchell v. Spokane,* 55 Wash. 86, 89, 104 P. 150 (1909).

■ As to the Wheelabrator contract, the taxpayers also contend the City has obligated general taxpayer indebtedness because of the contractual language under which the City agreed to set sufficiently large user fees ("tipping fees") for the facility so the revenues generated, "along with other available revenues", are enough to cover the costs of the facility's operation. We have held in similar contractual settings, however, that use of the phrase "other available revenues" does not trigger the taxing body's general indebtedness, but refers only to other specific sources of revenue arising from the particular project. *See PUD 1 v. WPPSS,* 104 Wn.2d 353, 374–75, 705 P.2d 1195, 713 P.2d 1109 (1985); *Griffin v. Tacoma,* 49 Wash. 524, 531, 95 P. 1107 (1908).

Finally, appellants assert the "intent" of those who drafted and supported the initiative ordinance was to require a voter referendum for all major capital projects. That may have been the intention; it is not what was written. Intent is not relevant unless there is an ambiguity in the language. *State v. Johnson, supra.* With the addition of the words "requiring indebtedness of the taxpayers and property owners for capital projects", all ambiguity disappeared. Implicit in the argument of appellants is a suggestion of ignorance on the part of voters as to the difference between revenue and general obligation bonds. We believe any such claim of lack of knowledge on the part of the electorate as to this fundamental distinction is unwarranted.

The current project involves no general obligation (taxpayer or property owner) indebtedness; the initiative ordinance does not apply to this project. Because of our holding as to the scope of the initiative ordinance, we need not consider other issues addressed by the parties.

The trial court is affirmed.

PEARSON, C.J., and UTTER, DORE, and ANDERSEN, JJ., *concur.*

DURHAM, J. (dissenting)—By ignoring a specific provision in the initiative before us, the majority threatens the right of the citizens of this state to govern themselves as provided for in our state constitution and various city charters.[1] The majority turns its back on well established rules of statutory interpretation and closes its eyes to the clear intent of the citizens of Spokane, thereby casting a pall over the entire initiative process. This intrusion into one of our most sacred democratic processes cannot go unchallenged, and I must dissent.

The citizens of Spokane passed, with a majority of 70 percent of the vote, an initiative asserting their right to exercise approval of certain capital expenditures. The most important part of that initiative reads as follows:

> That the city charter of the City of Spokane be amended to provide that *a vote of the people be required for capital expenditures* (excepting that no vote of the people shall be required for expenditures to provide for the necessary and legitimate expenses of the city, including maintenance and operation of existing facilities, assessments for construction of storm sewers, sanitary sewers, landfills, water mains and trunklines, street maintenance and construction, resurfacing streets, snow and ice control, and/or expenditures of an emergency nature) *requiring indebtedness of the taxpayers and property owners for capital projects, including the proposed mass burn plant for refuse disposal (Waste to Energy Plant).*

(Italics mine.)

In finding that the initiative does not apply to the waste incineration facility, the majority places exclusive emphasis on the phrase "requiring indebtedness of the taxpayers and

---

[1]The present case is based upon the right to present local initiatives as granted in the Spokane City Charter. Nonetheless, the majority's holding provides a basis for future attacks on constitutionally founded initiatives.

property owners." Expenditures for the incineration facility do not require public approval because such expenditures do not require taxpayer indebtedness. Thus, the majority holds there is no ambiguity in the ordinance and the intent of the voters is irrelevant.[2]

Very tidy reasoning, indeed. Of course, it also completely ignores the final 13 words of the ordinance: "including the proposed mass burn plant for refuse disposal (Waste to Energy Plant)." Only by ignoring this phrase can the majority claim that the ordinance is clear. Its presence creates an ambiguity along the lines of "this law applies only to dogs, including Garfield the cat." This incongruity can only be resolved by using the rules of statutory interpretation.

These rules are fully applicable to the interpretation of initiatives. *E.g., Hi–Starr, Inc. v. Liquor Control Bd.,* 106 Wn.2d 455, 460, 722 P.2d 808 (1986). "[W]e must look to the voters' intent and the language of the [i]nitiative as the average informed lay voter would read it.'" *Estate of Turner v. Department of Rev.,* 106 Wn.2d 649, 654, 724 P.2d 1013 (1986) (quoting *In re Estate of Hitchman,* 100 Wn.2d 464, 467, 670 P.2d 655 (1983)). In determining the voters' intent,[3] courts should not read into an initiative

---

[2]To bolster its position, the majority ascribes to the Spokane citizenry a suspiciously convenient degree of financial sophistication:

> Implicit in the argument of appellants is a suggestion of ignorance on the part of voters as to the difference between revenue and general obligation bonds. We believe any such claim of lack of knowledge on the part of the electorate as to this fundamental distinction is unwarranted.

Majority, at 99. Thus, the majority concludes, in effect, that Spokane citizens are smart enough to identify various types of government debentures and the consequences thereof, but that they cannot draft an initiative worth submitting to the voters. Needless to say, the record contains no evidence on this subject.

[3]The key consideration in interpreting statutes is always legislative intent. *Seven Gables Corp. v. MGM/UA Entertainment Co.,* 106 Wn.2d 1, 6, 721 P.2d 1 (1986); *see generally* 2A N. Singer, *Statutory Construction* § 45.05 (4th rev. ed. 1984). Whenever a statute is susceptible to two interpretations, the interpretation should be adopted that best advances the overall legislative purpose. *Seven Gables,* at 10; *Hart v. Peoples Nat'l Bank,* 91 Wn.2d 197, 588 P.2d 204 (1978), *cited in Everett v. O'Brien,* 31 Wn. App. 319, 322, 641 P.2d 714 (1982). Indeed,

"technical and debatable legal distinctions" that would not be apparent to the average informed lay voter. *Hitchman,* at 469. This standard grants a certain amount of leniency to the voters, in that we will not hold them as strictly to a literal interpretation of their words as we will the Legislature. Yet no sense of this leniency appears in the majority's analysis.

The voters' intent in this case is readily discernible. The circumstances surrounding the initiative process irrefutably demonstrate a plan to require a vote on the incineration project. The majority's factual recitation shows the extent to which the initiative was triggered specifically by this project. The initiative was generated at a time when community attention was focused on the advisability of this new project. Moreover, the initiative's sponsor was "Citizens for Clean Air", a group significantly involved in opposing the project. That the initiative was aimed directly at the incineration project cannot be denied. Applying the initiative ordinance to this project is the only interpretation that gives effect to that intent.

Additional support for the taxpayers' interpretation can be gleaned from application of those rules of statutory interpretation that focus on the language of the statute itself. If there is an "inescapable conflict" between a statute's general and specific terms, the specific terms prevail. 2A N. Singer, *Statutory Construction* § 46.05 (4th rev. ed. 1984). Moreover, whenever possible, a statute should be interpreted so that effect is given to every word. *E.g., Hanson v. Tacoma,* 105 Wn.2d 864, 871, 719 P.2d 104 (1986). The taxpayers' interpretation of the ordinance gives effect to the specific language in this case, *i.e.,* the final phrase, while the general language will be given effect in all other

---

this court has stated on several occasions that the spirit or intention prevails over the letter of the law. *E.g., Estate of Turner v. Department of Rev.,* 106 Wn.2d 649, 654, 724 P.2d 1013 (1986); *Department of Rev. v. Hoppe,* 82 Wn.2d 549, 552, 512 P.2d 1094 (1973).

situations. By comparison, the majority's interpretation renders fully superfluous the initiative's specific language.

The majority's disregard for the clear intent behind this ordinance is particularly troublesome because a citizens' initiative is at issue. This court previously has underscored the importance of the initiative process in a representative democracy:

> In our modern society many functions of an earlier, New England town meeting variety of pure democracy have been relinquished to the various modern institutions of our representative form of government. It is often forgotten—but it should be remembered as axiomatic—that our representative democracy exists and operates on the basis of its delegated authority and power derived from the people or the electorate of the states and the union. Sovereignty of the populace and the electorate relative to representative or organized government is dramatically evidenced in the phrase "We the people . . . do ordain," contained in the preambles of the constitutions of the United States and the State of Washington.

*Fritz v. Gorton,* 83 Wn.2d 275, 279–80, 517 P.2d 911, *appeal dismissed,* 417 U.S. 902 (1974).

Our court has recently reaffirmed the significance of the initiative process, albeit in another context. Writing for a plurality of the court in *Alderwood Assocs. v. Washington Envtl. Coun.,* 96 Wn.2d 230, 635 P.2d 108 (1981), Justice Utter repeatedly emphasized the vital role the initiative process plays in state government. *Alderwood Assocs.,* at 239–40, 244–45, 246. Justice Dolliver, in his concurring opinion, eloquently stated the necessity of allowing the initiative process to thrive:

> The overriding public interest here involved is to make the initiative process available to all. The court recognized in *State ex rel. Brislawn v. Meath,* 84 Wash. 302, 317–18, 147 P. 11 (1915), that the role created for the people by amendment 7 was closely akin to that of a fourth branch of government. *See also Stetson v. Seattle,* 74 Wash. 606, 134 P. 494 (1913). It has expressed the

conviction that the initiative and referendum constitutional and statutory provisions should be liberally construed, to the end that these popular legislative rights of the people should be preserved and rendered effective. *State ex rel. Booth v. Hinkle,* 148 Wash. 445, 451, 269 P. 818 (1928), and cases cited therein.

*Alderwood Assocs.,* at 252 (Dolliver, J., concurring). Thus, by failing to heed the voters' expression of popular sovereignty, the majority has thwarted a precious, vital aspect of the democratic process.

This is not to say that every initiative adopted by the people must be given effect. An initiative, just like a statute, is subject to constitutional limitations. *Yelle v. Kramer,* 83 Wn.2d 464, 472, 520 P.2d 927 (1974). Similarly, an initiative cannot be given effect if it exceeds the proper scope of the initiative power, such as by challenging an administrative rather than a legislative action. *See Ruano v. Spellman,* 81 Wn.2d 820, 823, 505 P.2d 447 (1973). Nevertheless, governmental accountability requires, at the very least, that a fair and realistic interpretation be given to citizens' initiatives. Sadly, the majority's holding in this case fails to do that.

Accordingly, I dissent from the majority's interpretation of the initiative ordinance.[4]

BRACHTENBACH, CALLOW, and GOODLOE, JJ., concur with DURHAM, J.

Reconsideration denied September 14, 1988.

---

[4]The City of Spokane has argued that application of the ordinance to this project would unconstitutionally impair existing contracts and would exceed the proper limits of the initiative power. I decline to address these arguments, however, because the majority's holding has rendered them moot.